DOMINIC BREIT *et al.*.

*v.*

JOHN S. YEATON *et al.*

*Filed at Springfield Sept. 30, 1881—Rehearing denied January Term, 1882.*

1. PARTIES—*who are necessary parties—and when one not a party may be bound by a decree.* Where the interest of one person is involved in that of another, and that other possesses the legal right, so that the interest may be asserted in his name, it is not necessary to bring both before the court to bind them by the decree.

2. If there is no tenant in tail in being, the first person in being entitled to the inheritance should be made a party to a bill in chancery affecting the title to land, and if there be no such person in being, then the tenant for life; and in such cases the decree will bind the other persons not in being.

3. SAME—*as to after-born children.* On bill by husband and wife, against trustees, to reform a marriage settlement made by the wife in contemplation of marriage, on the ground of mistake, her children, who are to take the estate in fee after the death of the party holding for life, are necessary parties. They, taking as purchasers, will not be affected by any decree to which they are not made parties, even though such decree is rendered before their birth.

4. SETTLEMENT *in anticipation of marriage—of restrictions as to alienation or disposition.* A woman, prior to marriage, may place such restrictions as she pleases upon the future alienation or disposition of her property, not forbidden by or contrary to the policy of the law; and when such restrictions are made to protect the property and herself from the influence of her husband, they will be regarded as of substance, and not of mere form.

5. POWER OF DISPOSITION *by married woman—by deed or will—as to the manner of execution.* Where a marriage settlement, made by a woman in view of marriage, places her property in the hands of trustees, the interest and dividends to be paid to the husband during the joint lives of the parties,

and the balance in such part and proportions, manner and form, as she shall, from time to time, during coverture, limit or appoint, by any writing or writings under her hand and seal, attested by three or more credible witnesses, or by her last will and testament, to be by her signed, sealed, etc., in the presence of the like number of witnesses, the power of appointment can not be exercised by her by an ordinary deed of conveyance, simply acknowledged as other deeds, but it must be as directed in the articles of settlement.

6. Where a woman, just before her marriage, with the consent of her intended husband, transfers her property, consisting of bank stock, to trustees, in trust for the husband during their joint lives, and for herself upon his death, in case she survives, but if she dies first, the remainder to her heirs at law, reserving a power of disposition, her power does not depend upon the statute, but upon the settlement, and she must pursue the mode she has appointed for the exercise of the power.

7. SAME—*of the effect of the Married Woman's act.* The Married Woman's act of 1861, conferring upon married women power to own and control property, as if sole, affects only the separate estate of married women derived in the mode provided therein. It does not apply to property conveyed by her to trustees before marriage, to be held upon certain trusts named in the conveyance, and has nothing to do with the exercise of powers reserved by her in a marriage settlement.

8. SAME—*effect of a deed by the wife to her husband.* A deed by a wife and her trustee, in 1868, of property conveyed by her to the trustee before marriage, to her husband, is void as a conveyance, and it is also void as an execution of the power of appointment, if not attested by three or more credible witnesses, as required in the conveyance to the trustee, reserving the power of disposition by the wife.

9. SAME—*aiding defective execution of power, in equity.* A defective execution of a power by a wife can not be aided in equity, in favor of her husband. The restrictions as to the form and mode of exercising such power are made for the protection of the wife against the husband, and are matters of substance, and not of mere form. Equity will never aid the execution of a power when the defect is a matter of substance.

10. TRUSTEE'S DEED—*condition precedent—how far essential—effect of recitals in the deed.* A party claiming title under a trustee's deed must show that every condition precedent to the vesting of the estate has been complied with, and where the power of a trustee to convey depends upon a written request of another, under seal, and attested by three or more credible witnesses, it is incumbent on those claiming under the deed of the trustee to show that such a written request was executed and attested, as required. The evidence of the performance of the condition precedent may probably be preserved by recitals in the trustee's deed.

11. EVIDENCE—*of the use of trust funds, by recital in deed.* The recital in a deed of a husband, conveying real estate to the trustee of his wife, that

the wife had directed a portion of the proceeds of the sale of her stocks by the trustee to be invested in the same real estate, instead of stating that the investment had been made, is *prima facie* evidence against the husband, and those claiming under him, that a portion of the proceeds of such bank stock was invested in such land, and the use of the deed, as evidence of this fact by the *cestuis que trust* of the bank stock, or its proceeds, does not make such deed binding and conclusive upon them for all purposes.

12. TRUST—*charging property purchased with trust funds with original trust.* The doctrine is well settled that a *cestui que trust* may pursue the proceeds of trust property, and charge with the original trust any property in which they may be invested, as against all who have actual or presumptive notice of the trust.

13. SAME—*charging property bought with trust funds, is optional with cestui que trust.* Where property is bought with trust funds, in violation of the trust, a trust will not absolutely and at all events attach to the property purchased. The *cestui que trust* will have the right to have it attach, or he may repudiate the trust, and disclaim any title, to the property, and proceed upon any other remedies he is entitled to, either *in rem* or *in personam.*

14. SAME—*right to charge property with, must be exercised in reasonable time.* In case of an optional right to defeat or divest a title, or to charge property with trusts, the party entitled to the option must, when aware of his right, exercise it promptly, and not, by delay and inattention, give reason for the belief that he has abandoned it.

15. NOTICE—*as to use of trust funds—recital in deed.* Where a deed made by a husband to a trustee recited that he had invested certain trust funds of his wife in the purchase of the land, and therefore conveyed such land to the trustee, to be held subject to the original trust, as modified by a decree of court, and he afterwards, without proper authority, procured a conveyance from the trustee to himself, of the land, it was *held,* that the recitals in the deed to the trustee (which deed was recorded) were sufficient to put purchasers from the husband on inquiry, and afforded notice that he held the lands in trust.

16. SAME—*as to condition precedent to power to convey—as shown by the face of the deed.* A deed from a wife and her trustee to her husband, for the expressed consideration of $5, for valuable real estate, not purporting to have been made upon the written request of the wife, attested by three witnesses, as required by the instrument creating the trust, or pursuant to any decree of court, when recorded is notice of its imperfection to all the world.

17. PARTITION—*effect as to parties having right to property as cestuis que trust.* Where a trust attaches to land held in common, a subsequent partition by the holder of the legal title will give no new title, but will only change the title to one in severalty, and the trust may be enforced against the part so set off in severalty.

Statement of the case.

18. SAME—*adjusting conflicting titles.* On bill in equity for the partition of lands, the court is invested by statute with power to adjust all conflicting titles, and it may set aside conveyances under which adverse titles are claimed.

19. LACHES—*when such as to defeat equitable relief.* Where a party has knowledge of the facts entitling him to equitable relief, and rests, without taking any steps to assert his rights, for nearly seven years, giving no excuse for his delay except ignorance of the law, his *laches* will be such as to bar his right to relief. It is otherwise when the party is ignorant of the facts affecting his rights, until shortly before suing.

20. IMPROVEMENTS—*allowed only to extent of enhanced value of land.* On setting aside conveyances of land and vesting the title in the complainant, it is proper to decree the payment of the amount of the enhanced value of the premises by reason of the improvements made under belief of title, less the value of the use and occupation of the premises. Improvements not enhancing the value of the land should not be required to be paid for.

WRIT OF ERROR to the Superior Court of Cook county; the Hon. JOHN A. JAMESON, Judge, presiding.

This was a bill in chancery, brought in the Superior Court of Cook county, on March 19, 1879, by John Southgate Yeaton, Alexina M. Yeaton, Ruth Yeaton Stuart, William C. Yeaton, Jr., and Mary F. Yeaton, against Dominic Breit, Robert Murray, Frederick E. Bradley, William C. Yeaton, Sr., Lucia C. Yeaton, Charles E. Stuart, and many others, claimants, parties interested in the lands in controversy, praying that William C. Yeaton, and those claiming under him, may be ordered to convey to the heirs at law of said Mary Frances Yeaton, deceased, the legal title to the premises, and for partition, etc.

The following agreement, in contemplation of marriage, was entered into at the time and by the parties therein named:

"Indenture dated October 27, 1849, between William C. Yeaton, of the first part, Mary Frances Du Val, of the second part, and Frederick W. Southgate and George W. Cowdery, of the third part:

"Whereas, a marriage is shortly intended between said William C. and Mary Frances, and said Mary Frances is possessed of certain bank stock (describing same); and whereas, it has been agreed that said William C. shall, after said marriage, receive and enjoy, during the joint lives of said William C. and Mary Frances, the dividends or interest of said stocks, and also that said stocks, after the decease of such of them as shall first die, shall be at the sole and only disposal of said Mary Frances, notwithstanding her coverture:

"Now, in pursuance of the before recited agreement, and in consideration of $5 paid to said Mary Frances by said Southgate and Cowdery, the said Mary Frances, by and with the consent of said William C., hath granted, etc., and by these presents doth grant, etc., to said Southgate and Cowdery, their executors, etc., all of said bank stocks, to have and hold said stocks, to said Southgate and Cowdery, their executors, etc., upon such trusts, nevertheless, and to and for such intents and purposes, and under such provisions and agreements, as are hereinafter mentioned, that is to say, in trust for the said Mary Frances and her assigns until the solemnization of said marriage, then upon trust that said Southgate and Cowdery, their executors, etc., shall pay to said William C. Yeaton, during the joint lives of said William C. and Mary Frances, all the interest or dividends of said stocks, to and for his own use and benefit; and after the decease of such of them, the said William C. and Mary Frances, as shall first die, then upon trust that said Southgate and Cowdery, their executors, etc., shall and do assign, transfer and pay over all of said bank stocks to said Mary Frances, in case she survives said William C. Yeaton, but if she die before him, then unto such person or persons, and at the time and times, and in such part and proportions, manner and form, as said Mary Frances shall, from time to time, notwithstanding her coverture, by any writing or writ-

ings under her hand and seal, attested by three or more
credible witnesses, or by her last will and testament in writ-
ing, to be by her signed, sealed, published and declared in
the presence of the like number of witnesses, direct, limit or
appoint; and in default of such appointment or will, then
the said Southgate and Cowdery, their executors, etc., are to
pay the dividends arising from the said stocks to the natural
or qualified guardian of the children that may be issue of
said marriage, and on their coming of age, or their being
married, to transfer the said stock to them in equal propor-
tions; but in the event of there being no issue, or the same
dying before they come of age, or before they are married,
then to transfer the same to said William C. Yeaton, but in
the event of the decease of said William C. Yeaton before
the same shall be actually conveyed and paid over to him,
then to such person or persons as would be the legal repre-
sentatives of said Mary Frances by the statute for the dis-
tribution of intestate estates.

"In witness whereof said parties have hereto set their hands
and seals, etc.

| | |
|---|---|
| WILLIAM C. YEATON, | [Seal.] |
| MARY FRANCES DU VAL, | [Seal.] |
| FREDERICK W. SOUTHGATE, | [Seal.] |
| G. W. COWDERY." | [Seal.] |

The marriage contemplated was solemnized shortly there-
after, and on the 15th day of November, 1851, said William
C. Yeaton and Mary Frances, his wife, filed their bill in the
circuit court of Alexandria county, Virginia, against said
Southgate and Cowdery, alleging therein said marriage settle-
ment and marriage, and further, that said settlement did not
express the intention of the parties thereto, as it did not give
the trustees authority to change the investment in the stocks
therein mentioned; that some of the stocks were much less
productive and less secure than other property which could
be procured and substituted; that the Patriotic Bank stock

had paid no interest for several years, and that said Patriotic Bank, as well as the banks of Metropolis and Washington, had not the advantage of a common charter; that the interest of all then or thereafter likely to be concerned, required that said trustees should have power to make a prudent change in said investments, either to real estate or other more secure and valuable bank or State stock, whenever directed by said William C. Yeaton and his wife, Mary Frances; and alleging further, that the failure to authorize and require said trustees to make such change, when occasion required, was the result of misapprehension and mistake at the time of making said deed, and that, until a short time before filing said bill, said William C. Yeaton and his said wife were under the impression that such authority was expressed in said deed; and alleging further, that such authority probably resulted to said trustees by implication, but that they were unwilling to assume the responsibility of its exercise, unless under the direction of a court of chancery; and alleging further, that it was prayed in said bill, so filed in said Alexandria county circuit court, that the intention of said Yeaton and his wife might be carried out, and that it was also prayed that the powers of said trustees might be declared to enable them to sell said stocks, and reinvest the proceeds for the benefit of said Yeaton and his wife, to be subject to the same conditions, uses and trusts as were specified in said deed; and alleging further, that it was also prayed that said trustees might be required to make such sale as to any of said stock, and to reinvest the proceeds of such sale, as said Yeaton and his wife might desire, in other good bank stock, State stock, or in real estate, and such authority to be continued and exercised as, from time to time, might become expedient and desirable for the interest of all concerned.

Southgate and Cowdery answered this bill, jointly and severally, wherein they admitted the execution and delivery of said settlement, but alleging that it was made for the special

benefit of said Mary Frances, and therein stated that if it was deemed beneficial for the interest of said Mary Frances, they were willing that any decree might be entered in the premises as would carry out the wishes of said Mary Frances and her said husband, they, the said trustees, being relieved from all responsibility in the execution of said decree. On the same day the following decree, omitting the caption, was rendered in said cause:

"The answer in this cause having been filed, and the cause set for hearing, by consent of parties, and the same now coming on for final decree on the bill, answer, and other proofs filed therewith, the court, on consideration thereof, doth now here, this 15th day of November, 1851, adjudge, order and decree that the defendants, trustees in the bill named, or the survivor of said trustees, do hereafter, on the written request of said complainants, W. C. Yeaton and wife, sell and dispose of the various stocks (or such portions as may be named in such request) contained in the marriage settlement between the said Yeaton and his wife, and invest the proceeds arising from such sale in such other property as the said Yeaton and wife may desire, the property then procured to be held by said trustees for the benefit of the wife of said Yeaton, as prescribed in said settlement, and subject to said trust; such power of sale and re-investment to be and continue in said trustees and the survivor of said trustees, to be exercised by them, from time to time, as may be just and expedient, and in accordance with the wishes of the parties concerned in interest,—the sales and re-investments thus made to be reported to this court regularly, as from time to time they may occur. But before the said trustees shall proceed to act under this decree, they shall give bond and security in the sum of $1000, to be approved by the clerk of this court, conditioned for the faithful performance of their duties under this decree."

Afterwards, William C. Yeaton executed and delivered to the grantee therein named, the following deed:

"Indenture made this 16th November, 1864, between William C. Yeaton, of the first part, and George W. Cowdery, (surviving trustee of Mary Frances Yeaton, wife of said William C. Yeaton, formerly Mary Frances Du Val,) of the second part. (Here recites the decree, in substance shown above.)

"And whereas, on the written request of said William C. Yeaton and wife, said stocks were sold, and a report of such sale returned to said court; and whereas, said Mary Frances has directed that a portion of the proceeds of sale of said stocks shall be invested in the real estate hereinafter described: Now, this indenture witnesseth, that said William C. Yeaton, in consideration of the premises, and in consideration of $9000, part of the proceeds of the sale aforesaid, to him in hand paid by said Cowdery, surviving trustee, the receipt whereof is acknowledged, does alien, remise, convey, etc., unto said Cowdery, surviving trustee, all the said William C. Yeaton's right, title and interest in and to the following real estate in Cook county, Illinois, (after naming other property): Outlot 17, of Canal Trustees' subdivision of section 33, town 39 north, range 14 east of the third principal meridian, which lot was conveyed to the said Yeaton and others by deed from James Birney and wife, dated May 8, 1857, of record in Cook county, in Book 142 of Deeds, page 321; to have and to hold all the interest of said William C. Yeaton in the above mentioned and described premises, to said Cowdery, surviving trustee, as aforesaid, in trust, however, for the use and benefit of said Mary Frances Yeaton, in accordance with the marriage settlement aforesaid, and with all powers of sale and substitution under the decree aforesaid.

"In witness whereof, etc., said first party sets his hand and seal, etc.                    WILLIAM C. YEATON." [Seal.]

And afterwards, the following was executed and delivered to the grantee therein: ,

"Indenture made 6th of November, 1868, between Mary Frances Yeaton, wife of William C. Yeaton, of the first part, George W. Cowdery, surviving trustee, etc., party of the second part, and said William C. Yeaton, party of the third part:

"Witnesseth: that the said party of the first part, in consideration of $5 paid by said party of the third part, the receipt whereof is acknowledged, and the said party of the second part, at the written request of said party of the first part, have aliened, etc., and do alien, remise, release, convey and confirm unto said party of the third part, his heirs and assigns forever, all the estate, right, title, etc., of the said parties of the first and second parts, of, in and to the following real estate in Cook county, Illinois: Out-lot 17, in Canal Trustees' subdivision of section 33, town 39 north, range 14 east of the third principal meridian, and other property, it being the same property which was, by deed dated 16th November, 1864, conveyed by said William C. Yeaton to the said George W. Cowdery, surviving trustee, to have and to hold the same to said party of the third part, his heirs and assigns forever.

"In witness whereof, said parties of the first and second parts set their hands and seals, etc.

M. F. YEATON,  [Seal.]

. G. W. COWDERY, [Seal.]

*Surviving Trustee.*"

The original interest of William C. Yeaton in this and other lots was that of an undivided one-half, and one Tazewell Taylor was the owner of the other undivided half, and on the 30th of November, 1869, a partition was effected of the lots, between Yeaton and Taylor, whereby Taylor conveyed to Yeaton his half to the lots in controversy, and Yeaton conveyed to Taylor his half in other lots.

About the 15th of July, 1871, Mary Frances Yeaton died intestate, leaving her surviving, her husband, William C. Yeaton, and the complainants, J. Southgate Yeaton, Alexina M. Yeaton, Ruth Y. Stuart, William C. Yeaton, and Mary F. Yeaton, and the defendant Lucia Chauncey Yeaton, her children and heirs at law, all of whom are issue of the said marriage between her and William C. Yeaton. Prior to her death, no direction, limitation or appointment of her interest in said premises, or any part thereof, except as before stated, was made. William C. Yeaton employed one Samuel Geber, a real estate agent in Chicago, and through him, on the 5th of July, 1872, he sold and conveyed certain of the property in controversy. Subsequently, other sales and conveyances were made. Prior to this, and before the death of his wife, William C. Yeaton had mortgaged certain portions of the property to raise money, etc.

Bill was filed by complainants for a conveyance by Yeaton, and others claiming under him, of the property, and for partition thereof. Answers were filed, and the cause was heard on bill, answers and proofs, and the court thereupon decreed in conformity with the prayer of the bill. The present writ of error is prosecuted by defendants below.

Mr. GEORGE W. SMITH, for the plaintiffs in error:

"Personal property," said Lord Thurlow, in 1789, in *Fettiplace* v. *Gorges*, 1 Ves. Jr. 49, "the moment it can be enjoyed must be enjoyed with all its incidents." So, when a married woman is allowed to enjoy any property as a *feme sole*, the privilege necessarily implies a *jus disponendi*. As the separate use can not exist but in the married state, so neither can the restraint upon anticipation. There is no form of limitation whereby a single woman can be prevented from even squandering her income or dissipating her means. In this respect she stands on the same footing as a man. *Brandon* v. *Robinson*, 18 Ves. 429.

The case of *Swift* v. *Castle*, 23 Ill. 209, was decided in 1859. The court there reasons from the common law incapacity of a married woman. See 1 Sugden on Powers, (sec. 3, par. 29, marg. p. 200, 3d. ed.) 253. But under the statutes of 1861, 1867, 1869 and 1874, a new policy was adopted. Under these the wife holds an absolute legal estate as against her husband, the same as a *feme sole*. *Patten* v. *Patten*, 75 Ill. 446.

A power to be executed in writing, under the party's hand and seal, attested by three credible witnesses, is well executed, though the attestation clause signed by the witnesses, only certifies to the sealing and delivery, and not to the signing. *Ladd* v. *Ladd*, 8 How. 10.

As to the proper execution of powers, counsel cited *Knowles* v. *Knowles*, 86 Ill. 1; *McClintie* v. *O'Chiltree*, 4 W. Va. 249; *West* v. *West*, 3 Rand. 373; *Williamson* v. *Beckman*, 8 Leigh, 20; *Justis* v. *English*, 30 Gratt. 565; *Cocker* v. *Quayle*, 1 Russ. & Mylne, 535.

As to the power of the court to reform marriage settlements, counsel, after reviewing the cases relied on by defendants in error, cited *Barrow* v. *Barrow*, 18 Beav. 532; *Sampayo* v. *Gould*, 12 Simon's Ch. 426; *Trever* v. *Trever*, 1 Eq. C. Ab. 387; *Elton* v. *Elton*, 27 Beav. 634; White & Tudor's Leading Cases, 36; 1 Story's Eq. Jur. secs. 160, 161, and notes; *Metropolitan Bank* v. *Godfrey*, 579.

In suits to enforce marriage settlements, it may be that children living are necessary parties, not, however, those not *in esse*. Story's Eq. Pl. secs. 145, 792.

As to aiding the defective execution of powers, counsel cited 1 Sugden on Powers (3d Am. ed.) 300; *Pool* v. *Potter*, 63 Ill. 533; *Marshall* v. *Stephens*, 8 Humph. 159.

If defendants in error wished to avoid the Alexandria decree, or the conveyances by their father, why did they not act earlier? They should have been vigilant to ascertain their rights, and to prevent other persons from being preju-

diced.    *Hamilton* v. *Lubukee,* 51 Ill. 415; *Bush* v. *Sherman,* 80 id. 160; *Williams* v. *Rhodes,* 81 id. 571.

As to the allowance for improvements, counsel cited *Louvalle* v. *Menard,* 1 Gilm. 39; *Mahoney* v. *Mahoney,* 65 Ill. 406; *Harper* v. *Ely,* 70 id. 581.

Mr. W. W. EVANS, also for the plaintiffs in error:

1. No trust funds were ever, in fact, invested in the lands in question. It is claimed that defendants in error are estopped from denying the recitals in Yeaton's deed of 1864. The rule that parties are bound by the recitals contained in deeds in their chain of title, has reference only to those claiming under such chain, in privity with those sought to be bound. 2 Washburne on Real Prop. 463; *Carver* v. *Jackson,* 4 Pet. 83.

2. The sale of the stocks was authorized by the decree of the Alexandria circuit court. The defendants in error will not be allowed to profit by the decree so far as favorable, and to reject it where unfavorable.

3. A court of chancery has general power to amend a defective instrument of any nature. No exception is made in case of marriage settlements. Equity will rectify a settlement where a mistake has been made in it. Sugden on Powers, 560; Perry on Trusts, sec. 365; *Sampayo* v. *Gould,* 12 Sim. Ch. 426.

4. The objection that the Yeaton heirs were not born, and therefore not parties, can not have weight, as that would involve delay in reforming such instrument, till the "decease of a parent," as is suggested. However erroneous the decree may be, it would have force until reversed. It can not here be questioned collaterally.

5. It is a fair presumption that the trustee executed his trust in the manner required by the marriage settlement. *Marshall* v. *Stevens,* 8 Humph. 159; *Munn* v. *Burges,* 70 Ill. 614.

6. Mrs. Yeaton could make a conveyance of her interest in her own right, and her joining in the deed with the trustee, who held the legal title, was a sufficient request, in writing, for him to convey. *Knowles* v. *Knowles,* 86 Ill. 2.

Mr. JOHN P. WILSON, also for the plaintiffs in error:

An undivided one-half of the lots in question was never owned by the trustee, through whom defendants in error derive their claim of title.

Messrs. G. & W. GARNETT, for the defendants in error:

The power of disposition reserved to Mrs. Yeaton could be exercised only in the mode and manner specified in the settlement. *Swift* v. *Castle,* 23 Ill. 209; *Conkling* v. *Doul et al.* 67 id. 355; *Yeaton* v. *Yeaton,* 4 Bradw. 479; *Montgomery* v. *Agricultural Bank,* 10 S. & M. 566; *Doty* v. *Mitchell,* 9 id. 435; *Ladd* v. *Ladd,* 8 How. 10; *Cocker* v. *Quayle,* 1 Russ. & Mylne, 535; *Hopkins* v. *Myall,* 2 id. 86; *Maut* v. *Leith,* 15 Beav. 524; *Whiting* v. *Rust,* 1 Gratt. 483; *Burdett* v. *Spillsbury,* 6 M. & G. 407; *McClintie* v. *O'Chiltree,* 4 W. Va. 249.

Where there is a limitation over to the children in default of appointment, the wife is a *feme sole* only so far as she is made by the settlement. *Mores* v. *Huish,* 5 Ves. Jr. 692; *Whistler* v. *Newman,* 4 id. 129; *Richards* v. *Chambers,* 10 id. 580; *Cocker* v. *Quayle,* 1 Russ. & Mylne, 535; *Hopkins* v. *Myall,* 2 id. 86; *Maut* v. *Leith,* 15 Beav. 524.

The object of the Married Woman's act of 1861 was not to enable married women to destroy their marriage settlements by which their property had already been effectually protected for the benefit of themselves and their children. *Watson* v. *Bonney,* 2 Sandf. 412.

It has been uniformly held by this court, that the law of 1861 did not authorize a married woman to convey her separate estate, acquired under that act, without her husband joining in the deed. *Brooks* v. *Kearns,* 86 Ill. 547; *Elder* v.

*Jones,* 85 id. 384; *Bressler* v. *Kent,* 61 id. 426; *Cookson* v. *Toole,* 59 id. 521.

Lands purchased with the proceeds of sale of the separate personal estate of the wife, are also her separate estate, and subject to the same rules as the original personal estate. *Kirkpatrick* v. *Buford et al.* 21 Ark. 268; *Merrit* v. *Lyon,* 3 Barb. 110.

The future issue of the marriage had a contingent future estate, which could not be impaired or divested by any decree. *Watson* v. *Bonney,* 2 Sandf. 417; *Kinnard* v. *Daniel,* 13 B. Mon. 497; *Richards* v. *Fitzgerald,* 9 Irish Eq. 495; *Richards* v. *Chambers,* 10 Ves. Jr. 580; *McBride* v. *Greenwood,* 11 Ga. 379; *Gorin* v. *Gordon,* 38 Miss. 205; *Parker* v. *White,* 11 Ves. 219.

Where a trustee has power to sell upon the written request of the wife, a gift of it to the husband is void, though made upon the written request of the wife. *Morgan* v. *Elam,* 4 Yerg. 375; *Dunn* v. *Dunn,* 1 S. C. 354; *Ellis et al.* v. *Baker,* 1 Rand. 47.

A defective execution of a power will not be aided in favor of the husband of the donee of the power. 2 Sugden on Powers, 84, sec. 13.

To entitle a purchaser to such aid, he must be a purchaser from the donee of the power. 2 Sugden on Powers, 87, sec. 24. See, also, *Justis* v. *English et al.* 30 Gratt. 565; *Thackwell* v. *Gardiner,* 5 DeG. & S. 58; White & Tudor's Leading Cases in Eq. 373.

If there was any request executed other than the deed itself, the burden of proving it is on the plaintiffs in error. *Williams* v. *Peyton,* 4 Wheat. 79.

Yeaton, and those claiming under him, are estopped from denying the consideration of the deed of 1864. *Kimball* v. *Walker,* 30 Ill. 511; 1 Greenleaf on Evidence, sec. 211.

The deed of 1864 being on record, and referring to the trusts of the marriage settlement, was ample notice to purchasers

from Yeaton. *Railroad Co.* v. *Durant,* 5 Otto, 579; *Duncan* v. *Jandon,* 15 Wall. 175; *Shaw* v. *Spencer,* 100 Mass. 382; *Oliver* v. *Piatt,* 3 How. 333; *Bellos* v. *Lloyd,* 2 Watts, 401; *Justis* v. *English,* 30 Gratt. 575; 3 Washburne on Real Prop. 292, sec. 63.

This suit is fully justified by sec. 39 of the Partition act, which authorizes courts of equity to adjust all conflicting titles. *Henrichsen* v. *Hodgen,* 67 Ill. 179; *Harrer* v. *Wallner,* 80 id. 197.

There is no objection to a bill to remove a cloud, containing a prayer for partition; and a bill for specific performance may also embrace a prayer for partition. *Ross* v. *Cobb,* 48 Ill. 112; *Williams et al.* v. *Wiggand et al.* 53 id. 233.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

The question first in order, upon this record, is, does the decree of the circuit court of Alexandria, Virginia, bind the defendants in error? The answer depends upon whether there was jurisdiction over the persons, for there is no controversy in regard to the jurisdiction of the court over the subject matter. None of the defendants in error were made parties to that proceeding, and none of them were born at the time the decree was rendered, except J. Southgate.

Counsel for plaintiffs in error seem to concede that J. Southgate should have been made a party, but contend that it was competent to render a decree in that proceeding binding upon those not in being, and they cite Story's Equity Pleadings, secs. 145, 792, where it is said: "As it is sufficient to bring the first tenant in tail before the court, if in being, whether he be plaintiff or defendant in the suit, so, if there be no such tenant in tail in being, the first person in being entitled to the inheritance should be made a party, and if there be no such person in being, then the tenant for life; and in such cases the decree made will bind the other persons not in being." This is upon the principle that where

17—101 ILL.

the interest of one person is involved in that of another, and that other possesses the legal right, so that the interest may be asserted in his name, it is not necessary to bring both before the court.  MARSHALL, Ch. J., in *Hopkirk* v. *Page*, 2 Brock. 42.

Manifestly, then, the rule can have no application here. There is here no prior estate of inheritance, and the interests of the heirs at law are not involved in that of another, but, on the contrary, are adverse to all other interests to be derived under and by virtue of the power.  The decisions hold that the heirs at law, in cases like the present, are purchasers, and no decree will affect their rights to which they have not been made parties.  *Richards* v. *Chambers*, 10 Ves. 580; *Parker* v. *White*, 11 id. 219; *Richards* v. *Fitzgerald*, 9 Irish Eq. 495; *Kinnard* v. *Daniels*, 13 B. Mon. 497; *Graham* v. *Houghtalin*, 1 Vroom, 552; *Watson v. Bonney*, 2 Sandf. (Sup. Court,) 417; *McBride* v. *Greenwood*, 11 Ga. 379; *Gorin* v. *Gorin*, 38 Miss. 205.

But counsel contend, that even if this view be true, still Mrs. Yeaton might exercise her power of appointment in regard to the trust property by an ordinary deed of conveyance, simply acknowledged as other deeds, and without regard to the requirement in the deed of settlement that it should only be by a "writing or writings under her hand and seal, attested by three or more credible witnesses, or by her last will and testament in writing, to be by her signed, sealed, published and declared in the presence of the like number of witnesses."  This, we think, is very clearly incorrect.  A woman contemplating marriage, at the time and place this settlement was made, and having an estate of her own, might, and oftentimes, we conceive, would, have had a two-fold object in view in tying up her property by articles of marriage settlement: first, of course, to keep the property from passing, by virtue of the husband's marital rights, directly under his control; and secondly, to place the property beyond her own con-

trol during coverture, absolutely or conditionally, and subject to such restrictions as would reasonably protect her against the improper influences of her husband. And the articles themselves here furnish ample evidence of what was the controlling motive. We think it manifest it was to disable Mary Frances, during coverture, to alienate or dispose of the property, except under such restrictions as was thought would reasonably protect her against the improper influences of her husband.

In *Swift et al.* v. *Castle,* 23 Ill. 209, it was held a married woman can only convey her trust property (as a marriage settlement) in the manner authorized, and for the purposes specified, in the deed creating the trust; and the same rule, obviously, must apply to the exercise by her of a power of appointment under articles of marriage settlement. In proof of this the court there said: "When the instrument creating the trust confers upon her" (*i. e.* a married woman) "power to sell or dispose of the trust estate, she, for the purpose of executing the trust, is an attorney in fact, and all her acts, to be legal, must, as those of any other attorney in fact, strictly conform to the power delegated, and any deviation from its provisions will render the act void for want of authority. No reason is perceived why a court of equity should confer upon her additional powers to those contained in the instrument creating the trust, more than it should upon any other attorney in fact. To permit her to exercise such additional powers is only authorizing her to defeat the object of the trust, and to disregard the intention of the parties, which should control in this as in all other contracts, when it can be ascertained from the instrument." And again: "When the instrument creating the trust provides that it may be disposed of by one mode, it excludes all others. * * * It appears to us that the true rule is, that the *cestui que trust* should be restrained to the acts

authorized by the declaration of the trust, and that all beyond the power thus delegated should be held to be void."

In *Justis* v. *English*, 30 Gratt. 565, the marriage settlement gave Mrs. Leber power to appoint "by any writings under her hand and seal, attested by three or more credible witnesses." Mrs. Leber executed a deed of the property to Watkins, one of the trustees, which was not signed, sealed and attested as required by the deed of settlement. BURKS, J., in delivering the opinion of the court, said: "I do not perceive on what ground it can be maintained that the execution of the deed to Watkins was such a disposition of the property as is authorized by the deed of settlement. The writing contemplated is a writing under the hand and seal of the *cestui que trust*, attested by at least three credible witnesses, directing the trustee to convey or transfer the property as may be appointed. The deed executed has none of the requisites, except that it is a writing under the hand and seal of the *cestui que trust*. It does not in terms direct a conveyance or transfer of the property, is not addressed to the trustees with that view, and is not attested.  *  *  *  In marriage settlements the object generally is two-fold,—to protect the wife against the control and influence of her husband, and also against her own weakness and incapacity,—and I am not disposed, by construction and the active assistance of the court, to break down the safeguards which she has deliberately thrown around herself and her property." And he concludes by saying that, in his opinion, Watkins "acquired no estate, right, title or interest, legal or equitable," under the deed.

In *Montgomery* v. *Agricultural Bank*, 10 S. & M. 566, the property of the wife was secured to her separate use by ante nuptial settlement, which gave to her power to sell, dispose of, or devise it, by will or other written instrument, signed by her, and attested by two witnesses, in her presence. After marriage, the trustee and husband and wife joined in a mort-

gage to secure the husband's debt, and the mortgage was acknowledged, but not attested by two witnesses, as required by the settlement. The court held the mortgage void as to the wife's interest, and, among other things, said: "The form of disposal required by the settlement is by an instrument in writing, signed by the wife, and attested by two witnesses, in her presence, and by her request. Upon this subject it is sufficient to add to what has already been said in the case of *Minerva Doty et al.* v. *William S. Mitchell*, that the wife derives her power to dispose of the property, not from the law or statute, but from the settlement. Although under the statute an acknowledgment of a conveyance is equivalent to the attestation and proof by two witnesses, and even by one witness, by the decision of this court such is not the law governing the disposal of the separate property of a *feme covert*. She derives her power from the exception she herself makes by the settlement, and she must pursue the mode she has appointed for the exercise of the power."

In *Hopkins* v. *Myall*, 2 R. & M. 86, (6 Eng. Chancery, 409,) upon the marriage of Mr. and Mrs. Myall, certain property of the wife was assigned to trustees, upon trust for the wife, during her life, for her separate use, with remainder as the wife should appoint by any writing under her hand, attested by two witnesses; and for default of appointment, then, after the death of the wife, to the children of the marriage. The trustees, upon application of the husband and wife, made by letter signed by both of them, but not attested, parted with the trust fund to the husband. The wife died without having made any other appointment of the fund. Bill was filed by the children to compel the trustees to replace the fund. The Master of the Rolls, SIR JOHN LEACH, said: "The ceremonies required by the settlement were introduced for the express purpose of protecting the wife against the influence of the husband, and are matters of substance, and not of form; and without an adherence to those ceremonies, the interest

of the children could not be defeated." Like ruling, in principle, will be found in *Maut* v. *Leith*, 15 Beav. 524; *Cocker* v. *Quayle*, 1 R. & M. 535, (5 Eng. Chancery, 535); *Ladd* v. *Ladd*, 8 How. (U. S.) 10; *Doty* v. *Mitchell*, 9 S. & M. 435; *Whiting* v. *Rust*, 1 Gratt. 483; *Burdett* v. *Spillsbury*, 6 M. & G. 386, (46 Eng. Com. Law, 385.)

The point, however, is made, that our Married Woman's act of 1861 confers upon married women power to own and control property as if sole, and therefore, Mrs. Yeaton might exercise her power of appointment without regard to the restrictions and limitations in the settlement. This, we think, is entirely a misapprehension. That act affects only the separate estates of married women derived in the mode provided in the act. It has nothing whatever to do with the exercise of *powers* by her. We are unable to perceive why the restrictions here, if the power had even been given to be exercised by a *feme sole*, would not have been binding. As owner, Mrs. Yeaton, before marriage, might place such restrictions not forbidden by or contrary to the policy of the law, upon the future alienation or disposition of her property as she saw fit; and it can not be pretended that these restrictions are, in any degree, forbidden by or contrary to the policy of the law.

Under our law, prior to the act of 1861, a married woman could not alienate her real estate, except by strictly pursuing the mode prescribed by statute—the right being purely statutory. (*Moulton et ux.* v. *Hurd*, 20 Ill. 137.) And since the passage of that act, and prior to the amendment of 1874, a married woman could not convey her separate estate, acquired pursuant to the provisions of that act, unless her husband joined in the deed of conveyance. *Cookson* v. *Toole*, 59 Ill. 521; *Bressler* v. *Kent*, 61 id. 426; *Elder* v. *Jones*, 85 id. 384; *Brooks* v. *Kearns*, 86 id. 547. Nor would a court of equity, however clear the proof, reform such a deed by correcting a mistake in the certificate of the acknowledgment thereof,—

and this, because, as was said in *Lindley* v. *Smith et al.* 58 Ill. 250, "conveyances by married women for the transfer of their real estate or dower interest, do not take effect by delivery, as other deeds, but only by being acknowledged in the statutory mode," and that "an acknowledgment not in the mode prescribed must render the deed useless as a conveyance of title." See *Moulton et ux.* v. *Hurd, Lindley* v. *Smith, supra; Hutchings* v. *Huggins,* 59 Ill. 29 ; *Board of Trustees* v. *Davison,* 65 id. 124; *Rogers* v. *Higgins et al.* 48 id. 211. And inasmuch as it was only by enabling laws that a married woman could convey her real property, and the statute made it imperative that, to do so, she must join with her husband, a deed of conveyance by her, to him, was absolutely void. *Brooks* v. *Kearns, supra.*

So it results, necessarily, the deed by Cowdery and Mrs. Yeaton to Yeaton, treated as an attempted conveyance of her property, was absolutely void. Treated as an execution of the power of appointment, it was void because not attested by three or more credible witnesses, as required by the articles of settlement.

But it is again argued by counsel for plaintiffs in error, at most this was but a defective execution of a power, and it will be aided by a court of equity. In our opinion, this is not such a case as a court of equity will lend its aid in remedy of a defective execution of a power.

It is said in 2 Sugden on Powers, (3d Am. from 7th Lond. ed.) p. 84, *94, sec. 13 : "But it has been decided that a defective execution of a power by a wife can not be aided in favor of her husband ; nor can a disposition by a married woman, in conjunction with her husband, without the solemnities required by the power, although the trustees of the fund act upon it, be supported on the ground of the intention and the power to do the act; for the ceremonies in such a case are introduced for the express purpose of protecting the wife against the husband, and are matters of substance, and not

of form." This is sustained by *Hopkins* v. *Myall*, 2 R. & M. 86, referred to *supra*.

Again, the same authority, at p. 87, *98, says: "The characters of purchaser, wife, creditor, child, must be borne by the party claiming relief in relation to the donee of the power, and not to the person creating it." And again, on p. 89, sec. 26, it is said: "Where a man makes even a voluntary settlement, vesting the property in a trustee, and ties himself down to a specified mode of revoking it, equity will not presume that he intended to revoke the settlement by the acceptance of a conveyance to himself not expressing any such intention; and if there is any neglect of the solemnities required, yet equity will not supply the want of them, for the settler is entitled to no aid, but if he desire to regain the property, he must pursue his power." And *a fortiori* must he do so when he seeks to obtain his wife's property through her appointment under a power.

In *Justis* v. *English, supra,* it was contended that the deed made and acknowledged by Mrs. Leber was merely a defective execution of a power, which a court of equity would aid, but the court held otherwise, saying, page 574: "Aid is extended where the defect is in matters of form, never where it is in matters of substance. In the case before us, the instrument is not only inappropriate, and the execution of it not according to the form prescribed in that it is not attested by the requisite number of witnesses, but it is not attested at all. This is more than a mere informality. Attestation in some form, at least, or to some extent, would seem to be requisite. I regard it as essential to the due execution of the power in cases like the one before us. * * * By the instrument creating her separate estate, Mrs. Leber chose to restrain, limit and regulate her power of disposing of that estate. Equity, deviating from the rule of the common law, accords her this right. The restraint imposed was a modification of her estate. She thought proper to make the

presence of witnesses,—at least three credible witnesses,—necessary to attest the disposition of her property, and for a court of equity to give effect to an alleged disposition, and that to her own trustee, made in the absence of any witness, would seem more like creating a power than aiding in the execution of one."

In *Thockwell* v. *Gardiner*, 5 DeG. & S. 58, the marriage settlement provided for settlements of the intended wife's personal property (being a bond for £1500) to her separate use for life, and then to her children, and giving her power to appoint the same by instrument attested by two credible witnesses. She wrote a letter to some bankers with whom her husband did business, and whom he owed, agreeing they might hold the bond as collateral, for advances they had made her husband, or which they might thereafter make to him. The letter was not attested. The bankers afterwards made advances to the husband on the faith of the letter. The court held that the letter was a good pledge of her life estate in the bond, but not being attested by two witnesses, was not a valid appointment of the remainder, under the power, and it was said: "There is no doubt that this court will aid the defective execution of a power in favor of a creditor or purchaser, and that it will do so though the donee of the power be a married woman; but the court, in such cases, must be satisfied that the formalities which have not been observed are no more than matters of form, and that the donee has not, by their non-observance, been deprived of any of the protection which a due exercise of the power would have afforded her; and the court looks with especial jealousy on a transaction in which the wife may have acted under the influence of her husband. The case of *Hopkins* v. *Myall* illustrated the principles of the court in this respect. In the present case the plaintiffs have proved nothing beyond Mrs. Gardiner's signature to the letter. * * * It thus appears that Mrs. G.'s signature was obtained by her husband for his own purpose,

without that protection against his influence which the power contemplated."

But the question still occurs, whether the power of appointment, here, was not in fact properly exercised, or, rather, under all the facts appearing, is it not to be presumed that it was so exercised?

There is no evidence whatever that Mrs. Yeaton, "by any writing or writings under her hand and seal, attested by three or more credible witnesses, or by her last will and testament in writing, by her signed, sealed, published and declared in the presence of the like number of witnesses," directed, limited or appointed the assignment, transfer or payment of the bank stock, or its proceeds, or the conveyance of the real estate in which its proceeds were invested, and which is now here in controversy, to Yeaton, or to any one else. It simply appears that on the 6th of November, 1868, Mary Frances Yeaton, wife of William C. Yeaton, and George W. Cowdery, surviving trustee, by an instrument in writing of that date, purport, in consideration of $5, at the written request of Mary Frances, to convey the property in controversy to William C. Yeaton. It is not recited that the written request is attested by any witnesses, and the purported conveyance is unattested by witnesses, and the certificate of acknowledgment fails to show that Mrs. Yeaton was, by the officer taking the acknowledgment, made acquainted with the contents of the instrument, and examined, separate and apart from her husband, as to whether she executed the same freely and voluntarily, and without any compulsion of her husband, as required by the statute then in force in this State; nor is there any proof that such certificate of acknowledgment was, under the laws of Virginia, where the acknowledgment was taken, sufficient to pass the title of the wife, or to bind and conclude her by the instrument. A party claiming title must show a compliance with every condition precedent to the vesting of the title. The request in writing, attested by

three or more credible witnesses, is here made, by the articles of settlement, a condition precedent to the vesting of title. The evidence might probably have been preserved by recitals in the deed of the trustee, or by the retention of the original instrument in writing; but however it should have been preserved, it was incumbent on those claiming under the deed of the trustee to show that it had been executed. It was that, and that alone, which gave the trustee authority to act. The principle is sanctioned by *Williams* v. *Peyton*, 4 Wheat. 79.

The point is made, and urged with much force, that the evidence fails to show that the proceeds of the bank stocks, which were the subject of the articles of settlement, went into this property. The deed of the 16th of November, 1864, recited, that by direction of Mary Frances a portion of the proceeds of the sale of the stocks had been invested in the real estate in controversy, and purports to be executed in consideration thereof. Some criticism is indulged on the form of expression, that Mrs. Yeaton had directed a portion of the proceeds of the sale *to be* invested, instead of reciting that the investment *had been* made. We think, taking the whole recital together, it is, in effect, an acknowledgment that the investment had been made. The conveyance was intended to vest the title. It was made, obviously, because the investment of the proceeds of the sale of the stocks had been made, for a mere direction to invest, without investing, could form no consideration, and be no inducement to convey. The language is carelessly used, but the meaning is, in our opinion, manifest enough. These admissions are, at least, *prima facie* evidence, against those claiming under Yeaton, of the truth of the facts admitted, and on considering the entire evidence relating to the question, we are not prepared to hold that it is insufficient to prove that proceeds of the sale of the stocks were invested in this property, but we think the reverse is sufficiently proven.

Another point made is, that on the 16th of November, 1864, the property belonged to William C. Yeaton, and he had the power to attach what trusts he chose, and by the terms of his deed then made he subjected it to the power of sale and substitution declared by the decree of the Alexandria circuit court. If this property was not otherwise chargeable with a trust, this position would doubtless be true; but if the property had been purchased by Yeaton, in the first instance, with trust funds, or if the consideration of his sale and conveyance was trust funds, he could by no declaration of his change the terms of the trust with which the funds invested in the land were originally charged. No doctrine is better settled than that the *cestui que trust* may pursue the proceeds of trust property, and charge with the original trust any property in which they may be invested, as against all who have actual or presumptive notice of the trust. Story's Eq. Jur. sec. 1255 *et seq.;* Perry on Trusts, sec. 217; *Alwood* v. *Mansfield,* 59 Ill. 507.

Since the evidence here shows that the stocks which were charged with a trust were sold, and their proceeds invested in this property, it follows the *cestuis que trust* may lawfully assert their claim,—not because of the trust declared by Yeaton's deed, but because of the trust with which the stocks were charged. Although the recitals in the deed are competent evidence of the facts recited against its maker and those claiming under him, the deed does not, by being used as evidence for this purpose, become binding and conclusive upon the defendants in error for all purposes. What the grantor admits by the deed, is one thing; what he, in consequence of the fact, admitted, or from other motives intended to effect by the deed, is another and entirely different thing. The admission, as against him and those claiming under him, but as against nobody else, proves the fact admitted. But the grant, and the declaration of the purpose of the grant, are no part of the admission, and although binding on

him and those claiming under him, is not binding on the grantee, where, as here, the admission shows the property is, because the consideration paid for it is charged with a trust, liable to be charged with the same trust, at the election of the *cestui que trust.* The right of the *cestui que trust* is to follow the trust property into whatever it may be converted, and, without regard to the form of the conveyance, establish and fasten upon it the original trust. There can be, as we conceive, no stronger reason for saying a trust can not be thus established where the grantor has expressly declared a different trust, than where he has made an absolute deed, for in both cases, and in the one precisely as in the other, it is the circumstances outside of, and independent of, the deed, and of which the deed itself may or may not furnish evidence, that establish the trust, and not the declarations of the grantor. Undoubtedly, where the *cestuis que trust* are in a condition to act for themselves, they may accept deeds in consideration for trust property or its proceeds, with new and different trusts, or without any trusts declared; but there is no cause for pretending this can have any application here.

Again, it is insisted that by the laws of Virginia, where Mrs. Yeaton was domiciled, she had power to dispose of the stocks (they being personal property) without reference to the clause in the articles of settlement requiring her to manifest her action in writing, attested by three witnesses, and *Justis* v. *English, supra,* is cited to sustain the position. It is enough to say that case only refers to "her separate personal property." These stocks, before her marriage, were disposed of by the articles of marriage settlement, so that she only retained the right to dispose of them, during the life of her husband, by exercising a power of appointment in the mode prescribed. After her marriage, and during coverture, they were not "her separate personal property," within the sense in which that language is used in *Justis* v. *English.*

It is said the present purchasers do not claim under the deed of 1864, and, striking out that deed, they have a perfect title,—they claim under Yeaton, who was seized before 1864, and who, upon the partition in 1869, was allotted his share in severalty. But upon what ground shall the deed of 1864 be stricken out? That deed was on record, and those who subsequently purchased this property, purchased with notice of its contents. It referred to the articles of marriage settlement, and showed that a portion of the proceeds of the sales of the stocks went into this property. It was ample for the purpose of putting subsequent purchasers upon their guard. By attending to its language they would have been led to a knowledge of the trust with which the property was charged, and this is sufficient as to all who claim under subsequent conveyances from Yeaton. *Justis* v. *English, supra; Oliver* v. *Piatt,* 3 How. (U. S.) 165; *Duncan* v. *Jandon,* 15 Wall. 165; *Railroad Co.* v. *Durant,* (5 Otto,) 95 U. S. 576.

So, also, the deed of 1868 carried notice of its imperfection upon its face, to all. Its record was notice that it was executed for but a nominal consideration,—that it was, in effect, a gift from the wife to the husband. It did not profess to be pursuant to the terms of a decree of a court of competent jurisdiction, nor purport to have been upon the written request of the wife, attested by three witnesses, nor even to have been acknowledged in conformity with the laws of this State.

The question is asked, "Why, if there was a trust declared by William C. Yeaton, in 1864, in an undivided one-half of the premises here in question, which was not divested, the whole of the premises should now be made to bear the burden?" The trust followed the title in Yeaton and his grantees. The partition gave no new title,—it simply changed its character from that of a tenant in common to an owner in severalty. (*Smith* v. *Crawford,* 81 Ill. 299.)

But it was optional only whether the *cestuis que trust* should pursue the proceeds of the sale of the bank stock, and treat the property now in controversy as held in trust for them upon the original trusts,—that is, the trust did not absolutely, and at all events, attach; there was simply the right in the *cestuis que trust* to have it attach, and, consequently, they might repudiate the trust and disclaim any title to the property, and proceed upon any other remedies to which they were entitled, either *in rem* or *in personam.* 2 Story's Equity Jur. sec. 1262. *Murray et al.* v. *Winter et al.* 2 Johns. Ch. 441.

The policy of our law is in favor of the free alienation of real property, and against tying it up, or otherwise fettering its alienation, for an unreasonable length of time; and therefore, in cases of optional rights to defeat or divest titles, or to charge property with trusts, the party entitled to the option must, when aware of his right, exercise it promptly, and not, by delay and inattention, give reason for the belief that he has abandoned it. J. Southgate Yeaton was born August 17, 1850, and was, consequently, twenty-one years of age on the 17th of August, 1871. The present bill was not filed until the 19th of March, 1879, and he admits that he became aware of the facts in regard to this property at least as early as 1872,—some seven years, or nearly so, before the filing of the bill. He says: "I have known, ever since I was a child, that my father was interested in Chicago property. Somewhere between 1869 and 1872 I first knew of the means by which my father acquired his title to such real estate. I have known that my father was borrowing money on said real estate ever since 1872, or about that time." His only excuse for his long delay in asserting his rights is, that about January, 1873, he consulted with what he regarded as a competent lawyer in regard to the title, and his opinion being that it was perfect in his father, he rested contented until about the time of the filing the bill, when he was awakened to a sense of his rights by the opinion of another

lawyer to a different effect. This amounts to no more than saying he was ignorant of the law, which can not avail. All, or the principal part, of the plaintiffs in error acquired their rights in this property since J. Southgate Yeaton had notice of his rights, and the proof also shows that he actively encouraged the agent of his father, subsequent to that time, to alienate and incumber the property. We think his *laches* has been such as now to preclude his right to any portion of this property. *Hamilton* v. *Lubukee et al.* 51 Ill. 415; *Bush* v. *Sherman,* 80 id. 160; *Williams* v. *Rhodes,* 81 id. 571; *Munn et al.* v. *Burges et al.* 70 id. 604; *Cox* v. *Montgomery,* 36 id. 396; *Winchell* v. *Edwards,* 57 id. 45; *Beach* v. *Shaw,* id. 17; *Burr* v. *Borden et al.* 61 id. 389; *Dempster* v. *West,* 69 id. 613.

As to the other defendants in error, the evidence shows that they were ignorant of the facts affecting their rights until shortly before the filing of the bill. They are not, therefore, chargeable with *laches.* Perry on Trusts, sec. 230.

An objection is urged against the form of the action, and it is insisted partition is not appropriate for the relief sought. The statute authorizes courts of equity to adjust all conflicting titles in such cases. (See *Henrichsen* v. *Hodgen,* 67 Ill. 179, and *Harrer* v. *Wallner,* 80 id. 197.) The suit was in equity, and plaintiffs in error had ample opportunity to interpose all their defences.

A final objection to be noticed is, that the decree should have directed the improvements to be paid for, without qualification. The decree directs that "the defendants, (or such of them as have made improvements upon any part of said premises, under the belief that they were the owners thereof,) or the grantees of such persons, are entitled to be paid the amount of the enhanced value of such premises, less the reasonable value of the use and occupation of such premises, exclusive of such improvements, during the time the same have been occupied by them," etc. We perceive no objection

to this. Certainly, improvements which have not enhanced the value of the premises should not be paid for. It is only equitable that there should be compensation in proportion to benefits. .

The decree of the court below, as respects the interest claimed by J. Southgate Yeaton, is reversed, and the cause remanded for further proceedings consistent with this opinion, but in all other respects it is affirmed.

*Decree reversed in part and in part affirmed.*

Subsequently, on an application for a rehearing, the following additional opinion was filed:

Per CURIAM: After careful consideration of the petition for rehearing, we feel compelled to deny its prayer. We have, however, availed ourselves of the opportunity thus afforded to correct an error which we had inadvertently committed in the opinion, in answer to one of the points of the plaintiffs in error; but this in nowise affects the result.

We do not regard the variance between the allegations in the bill and the proofs as material. Whether, when Yeaton purchased the property, he purchased with the trust funds, or whether he purchased it with other funds, but sold and conveyed it to Cowdery for the trust funds, can make no difference to the *cestuis que trust.* In either case their right to assert a claim to the property is because the trust funds were invested in the property; and, as we have attempted to show in the opinion, Yeaton, although he might have refused to sell for trust funds (the property not being charged with a trust before), having once done so, could, by no declaration in the deed, cut off or modify the right of the *cestuis que trust* · to follow the trust fund into what it was converted, and have this property charged with the same trust; and certainly he could not do so if he originally bought the property with the trust funds. Inasmuch as Yeaton took the legal title to himself, without any express declaration of trust, the fee was

18—101 ILL.

in law in him, and was conveyed by the deed to Cowdery, as is alleged; but whether the consideration for that conveyance was money invested by him in its purchase, or money received as the consideration for its sale by him, we conceive at present makes no difference, since the same right to follow the money into the land, and charge the land with the same trust to which the money is subject, exists in the one case that exists in the other.

The prayer for rehearing is denied.

*Rehearing denied.*