SUSAN P. BILLINGS *et al.*

*v.*

GEORGIA WILLIAMS WARREN *et al.*

*Opinion filed June 23, 1905.*

1. TRUSTS—*stock dividend is part of the corpus of the estate.* As between the life tenant entitled to the net income and the remainder-men entitled to the principal of a trust estate invested in capital stock, a stock dividend is part of the principal of the estate and goes to the remainder-men.

2. SAME—*when trust estate is not liable for the costs of litigation.* The costs of litigation, involving a trust estate, caused by the position assumed by the trustee's administrator, which was hostile to the estate and which did not involve a construction of the will creating the trust but only the determination of certain questions of the law of trusts, should not be borne by the trust estate.

3. WILLS—*ordinary meaning of words "net income" does not, of itself, control construction of a will.* The words "net income" ordinarily mean that which comes in from the principal and is payable to the beneficiary as received; but such meaning cannot be allowed, of itself, to control the construction of a will containing those words where other language used gives them a different signification.

4. SAME—*words "net income" construed to mean increase in value.* Under a will devising certain assets to a trustee, to "manage, invest, alter the investments and re-invest the assets as he may deem best," the *net income* of said trust estate to be applied to the use and benefit of the trustee and his wife during their joint lives and the life of the survivor of them, followed by a provision disposing of the remainder, the increase in value of land purchased with

the trust funds, from the time of the purchase to the death of the surviving beneficiary, belongs to his heirs, while the principal invested and the increase in value after the beneficiary's death belong to the remainder-men as part of the trust estate.

HAND, J., dissenting.

WRIT OF ERROR to the Circuit Court of Cook county; the Hon. MURRAY F. TULEY, Judge, presiding.

Charles P. Williams, residing at Stonington, Conn., died testate October 28, 1879. By his will, after making certain specific bequests, he directed, in section 8, that all the rest and residue of his estate should be held and managed by his executor, W. J. H. Pollard, for a period of two years after his death, at the end of which time the executor should make and file with the court of probate in Stonington an inventory of said residue as it should then be, with the executor's valuations of the same, and that such assets should thereupon be divided by him into 1945 shares of equal value and assigned to and among the devisees and legatees entitled thereto under the will. Section 13 of the will is as follows:

"*Thirteenth*—Two hundred and twenty-five shares (which shall include the charges referred to in the eighth section of this will against my daughter Mary W. Billings and against her husband, Coddington Billings, and against the two together, as in said section mentioned,) I dispose of as follows: The said charges I do give and bequeath to said Coddington and Mary, his wife, and all the rest of the said shares, and the assets belonging thereto, I do give, devise and bequeath to said Coddington in trust, upon the trusts following, viz.: To manage, invest, alter the investments and re-invest the assets in said shares so given him in trust as he may deem best, and the net income of said trust estate during their joint lives, and the life of the survivor of them, apply to the use and benefit of said Coddington and Mary W., and after the death of either of them to the use and benefit of the survivor of them, and upon the death of the survivor the whole principal of said trust estate shall be transferred

and assigned to such issue of said Mary as shall be then sur-
viving her, and failing such issue then surviving, to my chil-
dren by my said wife, Georgia."

On February 3, 1882, the executor made and filed in the
court of probate, as directed by the will, his inventory of all
the assets comprising the residue of the estate, with his valu-
ations thereof, and divided and assigned the same to and
among the persons entitled to the several shares, giving to
Coddington Billings, as trustee, under the thirteenth section,
assets of the value of $250,761.60, principally stocks, bonds,
notes and personal securities.   Certain assets belonging to
said residue were retained by the executor to meet contin-
gencies in the administration of the estate, from which there
were allotted and assigned to said Billings, as trustee, on
December 7, 1894, additional stocks and bonds of the value
of $6239.25.   Coddington Billings received the assets so as-
signed to him at the times stated, and continued in his trus-
teeship until his death, on January 24, 1896, a period of
about thirteen years.   His wife, Mary W. Billings, died
May 2, 1887, and at the time of the death of Coddington
Billings she had no living issue.  Therefore, upon the death
of the trustee, by the terms of the thirteenth section of the
will, Georgia Williams Warren, a daughter, and Charles P.
Williams, a son, who were the only children of the testator
by his wife, Georgia, became entitled to receive the principal
of said trust estate.   Shortly after Coddington Billings died
the Northern Trust Company was appointed administrator
of his estate by the probate court of Cook county, and the
defendants in error, Charles· P. Williams and George Henry
Warren, were appointed successors in trust by the court of
probate at Stonington, Conn.   In July, 1896, the adminis-
trator, by direction of the probate court of Cook county,
turned over to said successors in trust certain stocks, bonds
and securities which appeared to belong to the principal of
the trust estate.   On December 7, 1896, Georgia Williams
Warren and Charles P. Williams, insisting that the whole of

the principal of the trust estate had not been accounted for, instituted this suit, the successors in trust being joined with them as complainants. The bill was subsequently amended, and answers and replication duly filed, whereupon the cause was referred to a master to take and report the proofs, together with his conclusions, and upon the coming in of his report, and after objections and exceptions thereto had been overruled, the court entered a decree in favor of complainants, and defendants thereupon sued out this writ of error.

The defendants urged the following grounds of reversal: (1) That the court erred in holding that a stock dividend of 265 shares of the stock of the Chicago Gas Light and Coke Company, which came to Billings as trustee upon 630 shares of the stock of said company, which were a part of the original assets received by him, belonged to the principal of the said trust; (2) that the court erred in holding that certain real estate which Billings had acquired, located in the city of Chicago, belonged to the principal of said trust; and (3) that the court erred in refusing to allow to the administrator of Coddington Billings, deceased, and its solicitors, out of said trust fund, a reasonable sum for services and expenses incurred in the defense of this suit.

CURTIS H. REMY, PENCE & CARPENTER, MUSGRAVE, VROMAN & LEE, and DALE & FRANCIS, for plaintiffs in error:

This is neither an express trust nor a resulting trust. It is not an express trust, because if a purchase is made with trust funds held by the trustee and the title taken in his own individual name or in the name of another, with notice of the trust, such trust, if any, results to the beneficiary by operation of law, and not by any express declaration made by him. 1 Perry on Trusts, sec. 127; 1 Pomeroy's Eq. Jur. sec. 422; 2 id. 587; *Graham* v. *Graham,* 85 Ill. App. 460.

Stock dividends declared on profits earned belong to the income, and not to the capital, and should be distributed ac-

cordingly. *Lowry* v. *Trust Co.* 172 N. Y. 137; *McLouth* v. *Hunt,* 154 id. 179; *In the matter of Kernochan,* 104 id. 618; ·*Riggs* v. *Cragg,* 26 Hun, 89; *Hite's Devisees* v. *Hite's Exrs.* 93 Ky. 257; *Pritchitt* v. *Trust Co.* 96 Tenn. 472; *Earp's Appeal,* 28 Pa. St. 368; Thompson on Corp. secs. 2192, 2193, 2223; Cook on Corp. (4th ed.) secs. 552-560; Morawetz on Corp. (2d ed.) sec. 471.

The gift to Billings under the will of Williams was not of specific property, but was general and residuary in its character. The measure of the remainder is its value at the date of testator's death or at the date when the executor attached a value thereto and made distribution under the direction of the will, and the measure of the life estate is the increase thereafter. *In re Park's Estate,* 173 Pa. St. 190; *Oliver's Estate,* 136 id. 43; *Thomson's Estate,* 153 id. 332; *Wiltbank's Appeal,* 64 id. 256.

A resulting trust is superinduced upon the transaction by operation of law. It is independent of any intention and is forced upon the conscience of the party by operation of law. 1 Perry on Trusts, sec. 127.

A trust must result, if at all, the instant the deed is taken and the legal title vests in the grantee. No payment before or after a title is taken will create a resulting trust unless the transaction is such at the moment the title passes that a trust results from the transaction itself.

It is essential where several contribute to a purchase, in order to create a resulting trust, that it shall appear that the sums severally contributed were for some distinct interest or aliquot part of the estate, and the interest must be certain.

The burden of proof regarding a resulting trust is upon the party asserting the same, and the evidence must be clear, strong, unequivocal and unmistakable. *Alexander* v. *Tams,* 13 Ill. 221; *Perry* v. *McHenry,* id. 227; *Read* v. *Read,* 135 id. 482; *Stevenson* v. *McClintock,* 141 id. 604; *Strong* v. *Messenger,* 148 id. 431; *Vanbuskirk* v. *Vanbuskirk,* id. 19; 10 Am. & Eng. Ency. of Law, 29.

Isham, Lincoln & Beale, for defendants in error:

The statute is satisfied if the express trust is manifested by any writing in which the fiduciary relations between the parties, and its terms, can be clearly read.　1 Perry on Trusts, sec. 82; *Moore* v. *Pickett,* 62 Ill. 158; *Kingsbury* v. *Burnside,* 58 id. 310; *Keith* v. *Miller,* 174 id. 64; *Kellogg* v. *Peddicord,* 181 id. 22; *Mosher* v. *Funk,* 194 id. 351.

The law will not permit the trustee to personally hold an adverse title, and will presume that he holds it for the benefit of the trust.　1 Perry on Trusts, secs. 128, 129; *Davis* v. *Hamlin,* 108 Ill. 39; *King* v. *Cushman,* 41 id. 31; *Russell* v. *Peyton,* 4 Ill. App. 473; *Johnston* v. *Fletcher,* 32 id. 589.

The bill alleged an express trust, and the Statute of Frauds not having been pleaded, was waived.　1 Perry on Trusts, sec. 84; *Cozine* v. *Graham,* 2 Paige, 178; *Davies* v. *Otty,* 33 Beav. 540; *Carpenter* v. *Davis,* 72 Ill. 14.

The remainder-men were entitled to all gains and accretions to the trust fund made in the course of investment.

Where the principal of a trust fund is invested in corporate stock, the stock dividend issued against earnings which have become a part of the capital of the corporation represented by the old stock goes to the remainder-men—not to the life tenant.　*Barton's Trust,* L. R. 5 Eq. 238; *Bouch* v. *Sproule,* 12 App. Cas. 385; *Spooner* v. *Phillips,* 62 Conn. 62; *Mills* v. *Button,* 64 id. 2; *Minot* v. *Paine,* 99 Mass. 101; *Rand* v. *Hubbell,* 115 id. 461; *Lyman* v. *Pratt,* 66 N. E. Rep. 423; *Brown's Petition,* 14 R. I. 371; *Richardson* v. *Richardson,* 75 Me. 570; *Waterman* v. *Alden,* 42 Ill. App. 294; 144 Ill. 90; *Gibbons* v. *Mahon,* 136 U. S. 549; *Alsop* v. *DeKoven,* 107 Ill. App. 190.

Mr. Justice Wilkin delivered the opinion of the court:

In disposing of the first and third of the foregoing grounds of reversal, in an opinion by Justice Scott heretofore adopted, we said:

"*First*—Among the assets of the estate received from the executor of Charles P. Williams, deceased, by Coddington Billings, as trustee, on February 3, 1882, were 630 shares of the capital stock of the Chicago Gas Light and Coke Company. On November 7, 1882, that company, by resolution of its board of directors, increased its capital stock forty-two per cent and distributed the new stock ratably among the holders of the old stock, and on that day Billings, as trustee, received from said company 265 shares of its stock as a stock dividend upon the 630 shares of stock then held by him belonging to the principal of the trust estate. On March 22, 1887, he sold said 265 shares of stock for the sum of $11,262.50. The master, in stating the account, held that said 265 shares received as a stock dividend belonged to the principal of the trust estate and charged the amount received therefor by Billings to his administrator, and the trial court approved the action of the master in that regard. The question whether stock dividends similar to the stock dividends issued to Billings are income and go to the life tenant, or belong to the *corpus* of the trust estate and go to the remainder-men, was considered by this court in the case of *DeKoven* v. *Alsop*, 205 Ill. 309, and it was there held that a stock dividend, as between the life tenant entitled to the net income and the remainder-men entitled to the principal of a trust estate invested in capital stock, is a part of the principal of the trust estate and goes to the remainder-men. That case is decisive of the question at bar, and the trial court did not err in requiring the administrator of Billings to account for the amount received by Billings from the sale of the 265 shares of stock received by him as a stock dividend from the Chicago Gas Light and Coke Company upon the original 630 shares of stock received by him as a part of the principal of said trust estate. * * *

"*Third*—The position assumed by the administrator of the Billings estate was not in the interest of the trust estate, but hostile to it, and the expenses incurred by it in defending

this suit should not be paid out of the trust fund. This case, upon the facts, is very similar to that of *Haines* v. *Hay,* 169 Ill. 93, where it was said (p. 97) : "This litigation was not in the interest of the trust fund, but hostile to it, and no principle of equity will, as we conceive, permit the trust fund to be diminished to pay the expenses of such litigation. * * * The administrator represented the estate, and as such he had a right to make such defense as he thought its interests demanded, and the estate is liable for all costs so incurred, and not the party or estate against whom the defense was unsuccessfully made.' And in the view of this case taken by this court the defense has been but partially successful. Nor is there any ambiguity in the will involved which would justify the allowance claimed. The case turns not upon a construction of the will, but upon a determination of certain questions of the law of trusts and trustees. We do not think the court erred in refusing to make an allowance to the administrator of Coddington Billings, deceased, and its solicitors, out of said trust fund for expenses and services incurred in the defense of this suit."

We adhere to the conclusions thus announced on those questions. The second contention presents a more difficult point for decision, and we reached the conclusion on an application for a rehearing that it should be again considered.

The history of the dealings of Coddington Billings with the real estate in controversy is stated substantially as follows in the amended bill of the complainants: From time to time during the years 1881 and 1882, and the month of January, 1883, Coddington Billings, then of Chicago, and one Henry K. Sheldon, of Brooklyn, N. Y., jointly purchased various tax certificates and claims against blocks 72, 73 and 74 in the city of Chicago, and on the 30th day of January, 1883, they purchased from the South Park commissioners, who held a tax deed for the same, all interest which they then had in the said real estate, and took title thereto in the name of James O. Sheldon, a brother of Henry K. Sheldon,

who contributed nothing to the purchase of said real estate
and acquired no beneficial interest therein, and who after-
wards executed, acknowledged and delivered to said Billings
and Henry K. Sheldon his declaration of trust in writing,
setting forth that he had no beneficial interest in said real
estate, but merely held the legal title thereto for their exclu-
sive and joint use and benefit.  After said January 30, 1883,
(the date of the purchase from the South Park commission-
ers,) Billings and Henry K. Sheldon jointly purchased and
acquired other tax certificates and claims against said real
estate, and for the purpose of clearing up and strengthening
the title thereto, transferred to James O. Sheldon all of said
tax titles, certificates and claims, which were duly canceled
by them or procured to be assigned and conveyed to said
James O. Sheldon.  Thereafter it appeared that one Maria
S. Scammon had the fee simple title to said real estate, and
said Billings and Henry K. Sheldon, by agreement with her,
caused James O. Sheldon and wife to convey to her, by quit-
claim deed dated February 20, 1889, block 73 and the west
half of block 74, and she and her husband conveyed to James
O. Sheldon, by a quit-claim deed of the same date, block 72
and the east half of block 74, and thereafter he held the legal
title to block 72 and the east half of block 74 in trust for the
joint use and benefit of Billings and Henry K. Sheldon.  The
bill then shows that by a subsequent subdivision said blocks
72, 73 and 74 were added to Fernwood addition to Hyde
Park, by which the real estate then and now held by James
O. Sheldon became and is described as the east half of block 1
and all of block 3 in said addition.

It is further alleged in said amended bill that the original
purchase price paid by Billings and Henry K. Sheldon for
blocks 72, 73 and 74, including money expended by them in
the purchase of tax claims before and after January 30, 1883,
was about the sum of $40,000, of which each contributed
one-half; that from January 30, 1883, the date of the deed
from the South Park commissioners to James O. Sheldon,

216 · 19

until the conveyances to and from Mrs. Scammon, the taxes, assessments and charges against the said real estate to the death of said Billings, against that part now held by said James O. Sheldon, amounting in all to about $30,000, were furnished and paid by them in equal proportions; that the undivided one-half interest acquired by the said Coddington Billings was purchased by him for and to become a part of the trust estate then held by him under the thirteenth section of the will of Charles P. Williams; that all the moneys furnished, expended and used by said Billings in the purchase of said real estate and said tax claims against the same, and after said purchase in paying taxes, assessments and charges, amounting to about $35,000, were moneys of and belonging to the principal of said trust estate. The claim is then made that the complainants in equity are, and should be taken to be, the real and beneficial owners of the undivided one-half interest in and to the east half of block 1 and all of block 3 in said Fernwood addition to Hyde Park, and that said James O. Sheldon should be compelled to convey to them the legal title thereto; also, that they are willing and elect to accept said undivided one-half interest in lieu of the trust moneys invested therein and necessarily expended in connection therewith by said Coddington Billings. The widow and heirs of Coddington Billings, defendants, by their answer to this part of the amended bill deny that any portion of the trust estate held by Coddington Billings was invested in said real estate, and aver that he was, in fact, at the time of his decease the legal owner of the undivided half interest in said property; that the investment was made by him jointly with Henry K. Sheldon from his own funds, and deny that the complainants are in any sense the beneficial owners thereof.

The master found that Coddington Billings, in the purchase of said property, used $3298.11 of his own money prior to receiving the trust fund and subsequently invested therein $15,341.85 of the principal of said fund, and thereafter paid out on special assessments, taxes and other charges

against said real estate the sum of $15,947.57, also out of the trust estate, making the whole amount of such trust estate so expended $31,289.42, which, with the $3298.11 of his individual moneys, aggregated $34,587.53. It is not denied but that the investment of $31,289.42 was from the principal of said trust estate, nor that the complainants are entitled to a lien on the Fernwood property to secure the payment to them of that amount. We also think the evidence fully justified the finding that Billings transferred to the trust estate the $3298.11 originally paid by him and thereafter treated that amount as an advancement for said trust estate, he having in the meantime used for his own purposes a large amount of that fund, so that the case was properly treated in the circuit court as though he had directly invested in said Fernwood property $34,587.53 of the principal of the trust estate.

It is insisted on behalf of the complainants below, and the decree of the circuit court finds, that they are entitled to pursue the trust fund so invested into the real estate, and that the increased value of the property must be treated as a part of the principal estate. The contention of the widow and heirs of Coddington Billings is, that although the full amount of said trust fund was invested in the real estate described in the bill, it did not thereby become a part of the principal of the trust estate, and all the complainants are entitled to is a lien upon the land for the amount so invested. The complainants claim, and the decree gives them, not only the principal fund invested, but all the gains or profits made by that investment, allowing Billings or his representatives no income therefrom whatever. While counsel for the respective parties differ widely as to the rules of law governing the trust estate as applied to this case and have filed very elaborate arguments in support of their respective contentions, the controversy between them grows largely, if not altogether, out of the different constructions which they place upon the thirteenth clause of the will of Charles P. Williams.

In other words, as we view the case the rights of the parties on this point must be determined by a construction of that clause of the will as to the power given to the trustee, and the benefits which the testator intended that he and his wife, Mary W., should receive. Counsel for the complainants contend that the language "to manage, invest, alter the investments and re-invest the assets in said shares so given him in trust as he may deem best, *and the net income* of said estate during their joint lives, and the life of the survivor of them, apply to the use and benefit of said Coddington Billings and Mary W.," gave Coddington Billings no power to invest the funds in property which would produce no "net income," which words (net income) they say do not mean profits realized from investments, and that if the trustee chose to invest in non-productive real estate with the view to profit, however much the gain may have proved to be, the life tenants could receive nothing and the remainder-men could elect to take the whole. The defendants, on the contrary, contend that "net income," as used by the testator, means any gain realized by the management, investment, altered investments or re-investments, and belongs, by the terms of the will, to the life tenants. That is, the complainants treat the question here involved as one purely between trustee and *cestui que trust,* the trustee having no personal interest whatever in the estate. If they are right in this position, we agree that by the plainest rules of the law of trusts the decree below is right. In that state of the case the evidence is clearly sufficient to establish either an express or resulting trust in the land. If the defendants are to be left entirely out of the case, surely the trustee, as such, could not be heard to admit that he had treated every cent of the money used by him in this property as belonging to the trust estate, and at the same time deny that the property so purchased and maintained belonged to the principal of that fund.

In this case, as in all other cases involving the construction of wills, the intention of the testator, as gathered from

the instrument, must prevail, unless to give effect to such intention would result in the violation of some positive rule of law or contravene the public policy of the State. Of course, it was perfectly lawful for Charles P. Williams to give Coddington Billings and Mary W., his wife, all the increase of the principal trust fund if he chose to do so, and we are inclined to the view that such was his intention as expressed in said thirteenth clause. The discretion conferred upon the trustee to manage, etc., said trust estate, and to invest the same "as he may deem best," is not in any way expressly limited or qualified. No time is expressed when the net income shall be applied to the use and benefit of the life tenants, whether annually, as received, or at the expiration of the trust. The trustee might, under this language, retain the income, together with the principal, until the termination of the trust. It may be admitted that ordinarily "net income" is understood to mean that which comes in from the principal and to be payable to the beneficiary as received, but such common understanding cannot be allowed, of itself, to control in the construction of the will. Supposing, in this case, Coddington Billings, upon receiving the trust funds, had invested them in non-productive land with a view of its increasing in value, and at the end of a year sold it for an advance and re-invested, and again sold at an advance; could it be seriously doubted that within the contemplation of the testator, by the terms of the thirteenth clause of his will, the gains so made would belong to Coddington Billings and his wife, Mary W.? It seems to us that whether it be called "net income," "profits," "gains" or "increase," the intention was that as a reward, in part, at least, for the management, investment, altered investments and re-investments, the trustee and his wife should receive the benefits arising from any investments which the trustee might see best to make. Therefore Coddington Billings, at the time of his death, which terminated the trust, as the survivor of his wife, Mary W., had an interest in the real estate to the extent of the increase

in value thereof, which descended to and became vested in his heirs, and it then became the duty of his successors in trust to treat the property as belonging, not to either party exclusively, but to both, according to their respective interests therein. In other words, they were jointly interested in the property, and the court, upon this bill, should have settled their respective rights therein according to its value at the date of the death of Billings, which would have given the defendants the increased value to that date, and the complainants the principal of the trust fund and any increase in value after the death of Coddington Billings to the date of the decree.

The decree of the circuit court will accordingly be reversed and the cause remanded, with directions to allow the parties to amend their pleadings if they shall see proper to do so, and for further proceedings in conformity with the views here expressed.      *Reversed and remanded.*

Mr. JUSTICE HAND, dissenting:

The testator did not give Coddington Billings, as trustee, in express terms, the power to invest said trust fund in real estate,—clearly not in unproductive real estate,—and no such power is implied in the will, the language thereof creating the power being, "to manage, invest, alter the investments and re-invest the assets in said shares so given him in trust as he may deem best, and the net income of said trust estate during their joint lives, and the life of the survivor of them, apply to the use and benefit of said Coddington and Mary W.," etc., showing the trust estate was to produce an income if the intention of the testator was carried out, which intention is inconsistent with the view that the trust estate should be tied up during the entire lifetime of one of the life tenants in vacant and unproductive real estate. If, however, it be conceded the trustee had the right to invest the trust fund in unproductive real estate, he had no right to make such investment in the name of another for his own

benefit, and the law is well settled that in case the trustee invests the trust fund in real estate, or otherwise, and takes the title in his own name or the name of another for his own benefit and in violation of his trust, a court of equity will follow the trust estate into all forms of investment which it may assume, (*Breit* v. *Yeaton,* 101 Ill. 242; *Maher* v. *Aldrich,* 205 id. 242;) and that the *cestui que trust,* where the trustee has violated his trust by investing the trust fund in his own name or in the name of another for his benefit, has the right to affirm the action of the trustee and reap the benefit of the investment, or to repudiate the action of the trustee and require him to account for the trust estate.

The above statement of the law does not seem to be denied, but it is contended that as the original purchase of the tax titles, etc., was made with the individual funds of Billings, and not with the trust funds, the *cestui que trust* can not elect to affirm the action of the trustee and be invested with the title to the land, but must be satisfied to recover the trust estate and with a lien upon the land for the amount invested in the land. If the trustee had converted other moneys of the estate to his own use and saw fit to re-pay those moneys to the estate by turning over to the trust estate his interest in said tax titles, etc., he being one of the life tenants and in part entitled to the income from the trust estate, as well as the trustee, and the remainder-men being willing he should thus re-pay the moneys which he had misappropriated, I know of no reason why a court of equity should refuse to permit him to thus satisfy his debt, and had he not voluntarily turned over his interest in the tax titles, etc., for the benefit of the trust estate, in equity I think, in view of the facts disclosed in this record, he would have been required so to do, as it has been frequently held a trustee may not buy in and hold an outstanding title for his own benefit which is hostile to the trust estate and thereby destroy the title of the trust estate; nor may he mingle the trust estate with his own property, and if he does thus mingle the

property of the two estates, the *cestui que trust* may follow the trust property and claim it all, unless the property of the trustee can be satisfactorily separated from the balance of the fund. In Lewin on Trusts (vol. 1, p. *298,) it is said: "The trustee, wherever the trust property may be placed, must always be careful not to amalgamate it with his own, for if he do, the *cestui que trust* will be held entitled to every portion of the blended property which the trustee cannot prove to be his own." In Perry on Trusts (vol. 1, sec. 447,) it is said: "The trustee must not mingle the trust fund with his own. If he does, the *cestui que trust* may follow the trust property and claim every part of the blended property which the trustee cannot identify as his own." And in *Halle* v. *National Park Bank of New York,* 140 Ill. 413, the court said (p. 421): "Can a trustee mix trust funds with his own, rightfully? The decree in this case finds what the trustee did, and the law pronounces that conduct wrongful, because it imperatively forbids the mixing of the trust funds with his own, and says if he does so the *cestui que trust* may follow the trust fund and claim every part of the blended property unless the trustee can identify his own."

Here the trustee caused to be conveyed to James O. Sheldon said tax titles, certificates and claims. He individually made a quit-claim deed to Sheldon of the property, so that Sheldon might be completely invested with all the title he had in the property, either personally or as trustee, and enabled to convey such title to Mrs. Scammon. He then brought about a compromise with the owner of the fee and caused her to convey to Sheldon the fee title to the portion of the property, one-half of which is now in controversy, and in his report as trustee concealed the fact that said real estate was purchased with trust funds. By his acts the tax titles, certificates and claims purchased by him with his own funds and the funds of the trust estate, the value of which was uncertain and not easily ascertained, were amalgamated and merged into the fee title, and he could no longer separate the

value of the tax titles, etc., purchased with his own funds from those purchased with the funds of the estate. As a result of such mixing of the tax titles, certificates and claims of the trust estate with those owned by himself, I think all of said real estate, so soon as the fee was placed in Sheldon, became a part of the trust estate.

From the copies of certain statements in writing, accounts and letters written to Mary W. Billings found in letter-press books kept by Billings, as trustee, it appears that Billings had carried his personal interest in said tax titles, etc., into his trust account as an asset belonging to said trust estate. It is claimed, however, said statements, accounts and letters were incompetent evidence, and if competent were not sufficient to show a transfer of the personal interest of the trustee in said tax titles, etc., to the trust estate. The statements and accounts kept by the trustee were clearly admissible, and the letters from Billings, as trustee, to his wife, were made to her as one of the life tenants interested in the income of the estate and in the preservation of the remainder of the estate that it might produce an income, and were not in the nature of confidential communications between husband and wife, and therefore privileged communications. I think the evidence, when considered as admissions of the trustee, competent, and sufficient to establish the fact that Billings had transferred his individual interest in said tax titles, certificates and claims to the trust account as an asset of the trust estate; but in the view I take of the case I do not regard that evidence of controlling force, and if it were disregarded the decree should still be affirmed on the ground that the Fernwood property was purchased mainly with the funds of the trust estate, and the individual interest of the trustee in the tax titles, etc., was so blended by him with the tax titles, certificates and claims purchased with the funds of the trust estate that they could not be separated, and he having taken the title to said property in the name of another for his use, the entire Fernwood property, by reason of those facts, be-

came a part of the trust estate, and the enhancement of its value upon sale cannot be treated as income and be decreed to the life tenant.

The rule here applied is not a harsh one as against the widow and heirs of Billings, as they claim through Billings, who was one of the life tenants as well as trustee, and have no greater rights and stand in no better light before the court than would Billings were he defending against a bill to have said real estate declared a part of the principal of said trust estate. He wrongfully mingled the property of the trust estate with his own, caused the property, which was vacant and unproductive, received in exchange therefor, to be placed in the name of another for his individual use, failed to include the property in his account to the court as trustee, and should have been required, in such case, by a court of equity, to surrender the property so purchased and held for his benefit, to the trust estate, upon the application of the remainder-men, and the remainder-men are entitled to the same relief as against his widow and heirs that they would have been entitled to as against Billings, through whom they claim. If the question arose between a life tenant and a remainder-man who was not a trustee or the representative of such trustee, it would be equitable to allow the life tenant, who otherwise, without his fault, would be deprived of the income upon the trust estate, interest upon the original investment; but it is far from equitable to allow a life tenant who is trustee, or his representative, not only interest on the fund which the trustee had misapplied, but the entire increase in value of the real estate in which the fund had been invested, which in this case was much more than the amount invested in the real estate by the trustee.