(No. 16846.—Decree modified and affirmed.)
BERTHA BENNETT *et al.* Appellees, *vs.* CLYDE B. WEBER,
Appellant.

*Opinion filed October 28, 1926—Rehearing denied Dec. 8, 1926.*

1. APPEALS AND ERRORS—*when decree in suit for partition and accounting of trust estate is final and appealable.* A decree in a suit for partition and an accounting of interests in a trust estate is final and appealable where it fixes and determines the rights and interests of the parties in the estate, orders a sale of the trust property and an accounting by the trustee, and, while referring the cause to the master to state the account, fixes and determines the rules governing the stating of the account.

2. SAME—*when a decree is final and appealable.* Where a decree finally fixes the rights of the parties it is final and may be reviewed on appeal or writ of error, even though it is not the last order in the case, as orders sometimes follow for the purpose of carrying out the decree.

3. TRUSTS—*a trustee cannot deal with trust on his own account.* A trustee cannot deal on his own account with the thing or the person falling within the trust, as he is not permitted to place himself in a position where it will be difficult for him to be honest and faithful to his trust.

4. SAME—*sale to trustee may be set aside at will of cestui que trust.* A trustee cannot purchase from himself or at his own sale, and the law does not stop to inquire into the fairness of the sale, but when a trustee of any description, or a person acting as agent for others, sells a trust estate and becomes himself interested in the purchase, either directly or indirectly, the *cestui que trust* is entitled, as a matter of course and at his election, to have the sale affirmed or set aside.

5. SAME—*end obtained by trustee cannot justify his acts.* The end or result accomplished by the trustee is not, alone, determinative of the rights of the parties in a suit calling a trustee to account, but the trustee's method of executing the trust free from his individual interest is of the essence of the trust.

6. SAME—*trustee cannot acquire title by making advancements to trust property.* A trustee holding legal title to a lot for the benefit of a widow in accordance with a trust agreement in the settlement of an estate cannot, by making advancements to improve a part of the lot by the erection or improvement of a building thereon, acquire any title to said portion of the lot, nor can any

agreement with the widow vest him with such title without the consent of other beneficiaries of the trust, but the trustee will be entitled to an equitable lien on the trust estate for his advancements.

7. SAME—*difficulty of making proof does not relieve trustee of liability to account.* Where a trustee has on his own account made advancements to the trust estate he cannot prevent a sale and an accounting of the trust property merely because it is difficult for him to prove items of expense and disbursement, but the beneficiaries are entitled, in equity, to a strict accounting, giving the trustee, in accordance with the proof, credit for his outlays in improving the trust property.

8. SAME—*when trustee is not entitled to compensation.* Where the trust agreement makes no provision for compensation to the trustee and the circumstances do not bring the case under any provision in the statute allowing compensation, the trustee will not be entitled to compensation although his services have benefited the trust estate.

9. SAME—*when trustee is not entitled to solicitors' fees.* Solicitors' fees should not be allowed a trustee where the litigation is necessary to enforce the rights of the *cestuis que trustent* in an action of accounting with the trustee.

APPEAL from the Circuit Court of Winnebago county; the Hon. E. D. REYNOLDS, Judge, presiding.

FISHER, NORTH, LINSCOTT & GIBBONEY, for appellant.

HYER & GILL, for appellees.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

Bernard A. Weber died intestate on January 13, 1911, seized of a part of out-lot 4 of the original town of Rockford. The parcel of land had an area of about one-half of an acre and was improved by a small frame house and a barn. The property was subject to an encumbrance of $1250. The decedent had no other property except household furniture and personal effects of little value. He left surviving Harriet E. Weber, his widow, and Marion Bacharach, Charlotte Isensee and Clyde B. Weber, his children and only heirs, all of whom were of age. Clyde B. Weber,

the son, was appointed administrator of the estate. Shortly after the intestate's death the Rockford Gas Light and Coke Company offered $5000, less expenses and commissions, for the real property. It was the desire of the children to provide the widow with a suitable home and to make provision for her maintenance during the declining years of her life. Pursuant to that desire an agreement was entered into by and between the widow and heirs, dated December 21, 1912, which provided: (1) That they would join in a warranty deed conveying the premises to the Rockford Gas Light and Coke Company; (2) that Clyde B. Weber should take and receive the proceeds of the sale and pay therefrom the mortgage on the property, the expenses of administering the estate and all expenses and commissions incident to the sale; (3) that he should invest the balance of the proceeds in safe securities and pay the income therefrom to Harriet E. Weber during her life, and in case such income should prove insufficient for her needs and comfort, that he should use as much of the principal as might be necessary for those purposes; (4) that in the event the widow so desired he might purchase a home for her out of the proceeds and take the title thereto in his name in trust, the use and income therefrom to be enjoyed by the widow; (5) that upon the death of the widow, after the payment of the debts and funeral expenses, the balance should be distributed equally among the three heirs; and (6) that Clyde B. Weber might act as such trustee without bond or surety and without the necessity of making reports or accounting to any court, and if for any reason he should fail to act, the county court of Winnebago county might appoint some suitable person to act in his stead.

The real estate was sold to the Rockford Gas Light and Coke Company. Subsequently Clyde B. Weber, in order to provide a home for the widow, purchased lot 10, in block 3, of S. M. Church's addition to the city of Rockford, and by warranty deed dated February 4, 1913, took the title thereto

in his name. On February 17, 1913, he executed and acknowledged an instrument which, after reciting Bernard A. Weber's death and ownership at the time of part of out-lot 4, the agreement of December 21, 1912, the sale of the property to the Rockford Gas Light and Coke Company, the subsequent purchase of lot 10, and his receipts and disbursements in both transactions, leaving a balance in his hands of $576.14, declared that he stood seized of lot 10 and held the balance in money in trust, pursuant to the agreement dated December 21, 1912.

Lot 10 was situated at the northwest corner of Chestnut and Stanley streets, in the city of Rockford. The lot was rectangular in shape and had a south frontage on Chestnut street of 66 feet and an east frontage on Stanley street of 156 feet. At the time of its purchase by the trustee the south end of the lot was improved by a frame house facing Chestnut street. The Rockford Gas Light and Coke Company could make no use of the house and barn on the part of out-lot 4 which it had purchased, and accordingly permitted Clyde B. Weber, the son, to move them to lot 10. The house was placed upon the north and the barn upon the central portion of the lot and both faced Stanley street. Clyde B. Weber remodeled the barn into a dwelling house and collected the rents derived therefrom. The widow occupied part of the north house and received the rent from the remaining portion of that house as well as from the house facing Chestnut street. The trustee paid taxes, made repairs and defrayed carrying charges upon the property and whenever necessary advanced moneys for the widow's support.

On June 21, 1917, Harriet E. Weber and Clyde B. Weber entered into an agreement which recited that on that day Harriet E. Weber had received from the estate of John C. Weber, as her share, $874.93; that pursuant to the agreement under which Clyde B. Weber acted as trustee he had made advancements on behalf of Harriet E. Weber

and the trust property amounting to $1017.72; that in addition thereto he had advanced the money to reconstruct the barn into the house on the middle of lot 10 and that the money so advanced had not been charged to the trust fund; that the parties assumed that Clyde B. Weber was the owner of that house and of the ground, approximately thirty feet in width, on which the house stood, and on that assumption Clyde B. Weber had collected the rents therefrom, and that there had been a verbal agreement between the parties that Clyde B. Weber should pay $250 for the ground and that this sum should be deducted from $1017.72 before mentioned, leaving a balance of $767.72. The agreement then provided for the payment of the sum of $874.93 to Clyde B. Weber; that out of it he should deposit $107.21 in the Forest City National Bank of Rockford to the credit of Harriet E. Weber, and that the balance of $767.72 left in his hands should settle the account between the parties. It was also provided that as against the trust property and the remaindermen interested in it, Clyde B. Weber should retain his right to receive any items of interest that might be due him for the use of the money advanced from time to time, and that he should not by reason of the agreement be foreclosed of his right to make such legal or equitable claims against the property and the remaindermen as might be due him, since it was his intention only to settle such claims as between Harriet E. Weber and himself. By the concluding paragraph he agreed to make advancements from time to time for the support of the widow in accordance with the original agreement.

Marion Bacharach, one of the heirs, died intestate in October, 1913. She left surviving Joseph Bacharach, her husband, and Bertha Bennett and Marion Hoppe, her children and only heirs-at-law. Harriet E. Weber, the widow, died intestate on October 19, 1922, at the age of eighty-two years. Shortly thereafter, on October 25, 1922, for the purpose of terminating the trust, Clyde B. Weber caused

an agreement to be drawn purporting to be between himself, Charlotte Isensee, Bertha Bennett and Marion Hoppe. After reciting the death of Bernard A. Weber, the names of his heirs, the making of the agreement of December 21, 1912, the purchase and acquisition of lot 10, the declaration of trust dated February 17, 1913, the death of Marion Bacharach intestate and the names of her heirs, the death of Harriet E. Weber, the widow, the making of advancements by Clyde B. Weber in behalf of the trust estate and of the widow, and the desire of the parties that the whole interest in the trust estate should be assigned and transferred to Clyde B. Weber, to the end that he might hold and own the property absolutely, the agreement provided (1) that Clyde B. Weber should pay Charlotte Isensee $500, Bertha Bennett $250 and Marion Hoppe $250, and that they should receive those sums, respectively, in satisfaction of their interests in the estate and in the personal belongings of Harriet E. Weber, including the sum on deposit to her credit in the Forest City National Bank of Rockford; and (2) that the trust agreement should cease and be determined and the title to the property vest in Clyde B. Weber, his heirs and assigns, in fee simple.

Weber caused this agreement to be sent to his sister, Charlotte Isensee, who resided in California. She signed the agreement, believing that it was satisfactory to the other heirs, and returned it. The agreement was then mailed to Joseph Bacharach, who with his two daughters, Bertha Bennett and Marion Hoppe, lived in Milwaukee, Wisconsin. Bacharach retained the contract, and on November 10, 1922, Weber, accompanied by his attorney, went to Milwaukee and conferred with Bacharach and his daughters. Bacharach, who was the spokesman for his daughters, said that Weber had not offered enough, because the property was worth more than $6000. The attorney then stated that Weber would let him have the property for that sum. Bacharach replied that he did not want the property but

that he had been informed that it was worth from $9000 to $11,000. He was then asked whether he questioned Weber's account, and the offer was made to show the figures by a small book which Weber drew from his pocket and exhibited to Bacharach and his daughters. Bacharach answered that he did not question Weber's figures and that his only complaint was that Weber would not pay more for the property. Neither Bertha Bennett nor Marion Hoppe signed the agreement and no understanding was reached at the conference.

Negotiations for a settlement continued. Bacharach insisted upon a complete statement of the rents collected and vouchers for all expenditures. Weber claimed to own the central thirty feet of lot 10, with the house thereon, and insisted that he was not for that reason obliged to account for the rent derived therefrom. He valued the whole of lot 10, with the three houses, at $6000, and the central portion, with the house he had built thereon, at $3000. The trust estate on this basis was worth $3000. He represented that he had expended in behalf of the estate and for the widow's support $3389.43. He charged himself with the initial balance of $576.14, as shown by the declaration of trust dated February 17, 1913, with $874.93 received from Harriet E. Weber as appears from the agreement of June 21, 1917, and with $250 for the sale of the middle portion of the lot to himself. These items aggregated $1701.07, and subtracted from $3389.43 left a balance of $1688.36 still due him. This balance, when deducted from $3000, Weber's valuation of the trust estate, left $1311.64, the net value of the estate for distribution among the beneficiaries. The settlement which Weber proposed by the draft of the contract dated October 25, 1922, involved an increase of this sum to $1500. Upon a second visit to Milwaukee by Weber and his attorney Bacharach demanded $2500 for each of his daughters, and he was told that such a figure was impossible. While these negotiations were in

323—19

progress Bertha Bennett and Marion Hoppe corresponded with their aunt, Charlotte Isensee, and she repudiated her signature to the agreement and disclaimed the settlement.

On September 20, 1923, Bertha Bennett, Marion Hoppe, Charlotte Isensee and Joseph Bacharach filed their bill for partition and an accounting in the circuit court of Winnebago county against Clyde B. Weber, individually and as trustee, and certain tenants in possession of the property. Weber answered the bill and filed a cross-bill against the original complainants. By the cross-bill he asked that the title to the middle thirty feet of lot 10 be confirmed in him; that the rest of the property be declared to be held in trust by him under the agreement of December 21, 1912; that he be permitted to sell the rest of the premises either at public or private sale; that the proceeds of sale be used to reimburse him for his advancements, costs and expenses, including reasonable solicitor's fees, and that the balance be distributed in accordance with the contract and the trust terminated, or, in the event the cross-defendants desired to accept his offer of purchase, then that a decree be entered accordingly. The cross-bill was answered by the original complainants. Upon a hearing a decree was entered which, among other things, found that Clyde B. Weber, the trustee, expended money in remodeling the barn into a house on the middle of lot 10; that he collected the rent from that house, and after the death of Harriet E. Weber, the widow, from the other two houses also; that he made expenditures for the support of his mother and the maintenance of the trust estate; that the determination of the amounts of such receipts and disbursements was reserved for future determination; that the agreement between Weber and his mother whereby he was to become the owner of the central portion of the property was not known to the complainants until after the death of Harriet E. Weber and that the complainants never approved or ratified that contract; that Harriet E. Weber had no title

to the trust property and was without authority to convey or contract to pass title to any part of it; that whatever right or interest Clyde B. Weber acquired by virtue of that agreement he held for the benefit of the *cestuis que trust* under the terms of the trust agreement; that upon the death of Harriet E. Weber it became his duty to render an account of his trusteeship and to terminate the trust by paying the debts and expenses and dividing the residue among the beneficiaries; that the agreement drawn on October 25, 1922, was the only attempt made by the trustee to terminate the trust and that the complainants were under no obligation to accept the offer so made; that the trustee was not entitled to any compensation for his services nor could he charge the trust estate with any sum for solicitor's fees; that the trustee paid sums of money to Weber & Furman for material and labor, and because he was interested in that copartnership his portion of the profits on its transactions with the trust estate should be credited to the estate; that whatever improvements Clyde B. Weber placed upon the property by the expenditure of his private funds belonged to and were a part of the trust estate for the benefit of the *cestuis que trust,* but that he had the right to charge the trust estate with the principal sums so expended and interest thereon at five per cent per annum; that the trustee should credit the estate with like interest on all sums collected by him as rent from the times they were respectively received; that the sum of $107.21 remaining after the adjustment of accounts recited in the agreement of June 21, 1917, on deposit in the Forest City National Bank of Rockford to the credit of Harriet E. Weber, was, with the accrued interest thereon, a part of the trust estate; that Clyde B. Weber, as trustee, had not made, but should make, a just and true accounting of his receipts and expenditures; that he and Charlotte Isensee were each entitled to an undivided one-third part of the trust estate and Bertha Bennett and Marion Hoppe to the remaining one-third in equal

parts, subject to the right of dower of Joseph Bacharach, the surviving husband of Marion Bacharach; that the rights of these parties were subject to the provisions of the trust agreement and to the payment of all lawful expenses arising out of its administration, and that it would be for their best interests to sell the trust estate and place the money arising from the sale in the hands of the clerk of the court to await its further order. The decree (1) dismissed the cross-bill for want of equity; (2) set aside the contract between Harriet E. Weber and Clyde B. Weber dated June 21, 1917, and the contract dated October 25, 1922, signed by Clyde B. Weber and Charlotte Isensee; (3) directed Clyde B. Weber to offer at private sale, for cash, lot 10 with its improvements, and, subject to the court's approval, to convey the rights and interests of the several heirs to the purchaser; (4) ordered Clyde B. Weber to deposit the proceeds of sale in a State or National bank in the name of the clerk of the court, taking a certificate of deposit therefor bearing interest, and to deliver the certificate to the clerk to await the court's further order; (5) directed the trustee to request of the Forest City National Bank the issuance of a certificate of deposit in the name of the clerk of the court for the money held by the bank to the credit of Harriet E. Weber, and to deposit the certificate with the clerk to await the court's further action; and (6) referred the cause to a master in chancery to take the account of Clyde B. Weber in relation to the trust, with specific directions as to the manner in which the account should be taken, and upon the conclusion of the master's hearings to report his findings, with a statement of the account, to the court. From that decree Clyde B. Weber prosecutes this appeal.

Appellees have moved to dismiss the appeal on the ground that the decree from which the appeal is taken is interlocutory and not final, and is not, therefore, appealable. By the decree the contract between the widow and

the trustee dated June 21, 1917, and the contract between
the trustee and Charlotte Isensee dated October 25, 1922,
were set aside; the central thirty feet of lot 10, with its
improvements, was declared to be a part of the trust estate
and not the individual property of the trustee; the respect-
ive rights or interests of the parties in the estate were fixed
and determined; a sale of the trust property was ordered;
an accounting by the trustee was awarded and the cause
was referred to the master to state the account. All the
matters in controversy between the parties, including the
rules governing the stating of the account, were finally fixed
and determined by the decree. A final decree is not neces-
sarily the last order in a case, for orders sometimes follow
for the purpose of carrying out the decree. When a decree
finally fixes the rights of the parties it is final and may be
reviewed on appeal or writ of error. (*Allison* v. *Drake,*
145 Ill. 500; *Klein* v. *Independent Brewing Ass'n,* 231 id.
594; *DeGrasse* v. *Gossard Co.* 236 id. 73.) The account-
ing under the order of reference is in the nature of an
execution of the present decree. The motion to dismiss the
appeal must therefore be denied.

Thirty-five errors are assigned by appellant. They ques-
tion the chancellor's findings of fact. The argument in
support of them is based upon the contentions that the ap-
pellant having provided a home for his mother on lot 10 had
the right, so far as the central portion of that lot was con-
cerned, to deal with her for its purchase apart from the
other parties to the trust agreement; that by his judicious
purchase and improvement of the lot and his successful
management of the property he reduced the indebtedness
owing to him by the estate and that his course resulted in
greater advantage to the estate than if he had not advanced
his personal funds.

Early in the history of this State it was laid down as a
general principle of equity that a trustee cannot deal on his
own account with the thing or the person falling within the

trust. (*Thorp* v. *McCullum,* 1 Gilm. 614.) A trustee is not permitted to place himself in a position where it will be difficult for him to be honest and faithful to his trust. (*Galbraith* v. *Tracy,* 153 Ill. 54; *Butler Paper Co.* v. *Robbins,* 151 id. 588; *Tyler* v. *Sanborn,* 128 id. 136.) The rule is not merely remedial of wrong actually committed, but it is also intended to prevent wrong. A trustee cannot purchase from himself or at his own sale. The law does not stop to inquire into the fairness of the sale or the adequacy of the price but stamps its disapproval upon a transaction which creates a conflict between the self-interest and integrity of the trustee. (39 Cyc. 366.) The general rule is, when a trustee of any description, or a person acting as agent for others, sells a trust estate and becomes himself interested, either directly or indirectly, in the purchase, the *cestui que trust* is entitled, as a matter of course, at his election, to have the sale affirmed or set aside. (*Borders* v. *Murphy,* 125 Ill. 577.) The end or result accomplished by the trustee is not, alone, determinative of the rights of the parties, but the trustee's method of executing the trust free from his individual interest is of the essence of the trust. Appellant's attempt to make a part of lot 10 his individual property without the knowledge or consent of the other parties to the trust agreement subjected him to the risk of a disagreement with those parties and denied him the means of justifying his act. Appellant could not, as trustee, make a part of lot 10 his own without the consent of the other beneficiaries. Although he might have an equitable lien on the trust estate for his advancements, he could not indemnify himself by treating a part of the trust estate as his individual property. Nor did the contract by which his mother agreed to sell him the central portion of lot 10 avail him. She had no title to the trust property and could not vest him, in his individual capacity, with the title to any part of it freed from the rights or interests of the other parties to the trust agreement.

Appellant recognizes the rule which governs a trustee in dealing with the trust property but seeks to show that the facts of the instant case warrant a departure from it. Reasons are assigned in extenuation of or as a justification for the course pursued. It is asserted that since the widow could not make use of the central thirty feet of the lot his purchase of it was of advantage to the estate; that the barn moved to that part of the lot was of no value, and having remodeled it into a house at his expense no one should be heard to complain; that no objection had been made to the contract between his mother and himself although the fact of its existence could have been ascertained by inquiry; that after the widow's death an early and inexpensive distribution of the trust estate was desired by the parties interested, and the settlement he proposed involved the distribution of a sum in excess of what he considered the trust property to be worth; that because of his close relationship and affection for his mother he had not demanded from her receipts for his advancements to her in all instances; that because of his occupation of tinsmith he was not accustomed to keeping accurate or complete books of account; that during the negotiations for the settlement of the estate some of the appellees had seen his vouchers and made no objection to his expenditures; that while he should account for the value of the ground upon which he built the house for himself it is neither fair nor equitable to require him to sell the whole of lot 10 at private sale, because he may not be able to do so advantageously to the estate or to himself, and that he should not be penalized because he is unable to agree with the other beneficiaries concerning the value of the trust property. To these and similar arguments advanced by appellant a sufficient answer is that it is not inequitable to require that lot 10, purchased in pursuance of the trust, be treated, with the improvements thereon, as trust property from beginning to end, and that the trustee receive credit for all his outlays, with interest, as indicated

by the decree. It may, as appellant states, be difficult to prove items of expense and disbursement, and it is not unlikely that his advancements of money to his mother without taking receipts were many, but the proof of expenditures is not confined to the production of vouchers. Difficulty in making such proof does not, however, afford a reason why the rule of strict accountability by a trustee should be relaxed. He is presumed to know his duties. The beneficiaries of a trust have a right to demand an accounting from the trustee, and the enforcement of that right is a proper subject of equity jurisdiction. *People* v. *Bordeaux,* 242 Ill. 327.

Appellant contends that he should receive compensation for his services as trustee and that an allowance of solicitor's fees should be made to him in this case. The trust agreement made no provision for compensation. There is no provision in the statute allowing compensation to a trustee under the circumstances shown. (*Metropolitan Life Ins. Co.* v. *Kinsley,* 269 Ill. 529; *Fox* v. *Fox,* 250 id. 384.) Solicitor's fees should not be allowed where litigation is necessary to enforce the rights of the *cestuis que trust.* (*Billings* v. *Warren,* 216 Ill. 281; *Haines* v. *Hay,* 169 id. 93.) It does not follow, however, that appellant will be precluded from taking credit in his accounting as trustee for such reasonable attorney's or solicitor's fees, broker's commissions and necessary expenses as he may hereafter incur in the sale of the trust property and the settlement of the estate.

The chancellor found that the sum of $107.21, with the accrued interest, on deposit in the Forest City National Bank of Rockford was a part of the trust estate and by the decree directed appellant to request the bank to issue a certificate of deposit to the clerk of the court for the money so held. The fund was derived from a source wholly independent of the trust estate. It was the individual property of Harriet E. Weber and upon her death constituted a

part of her estate subject to administration. Hence it was not a part of the trust estate and the provisions of the decree in respect to that fund are erroneous.

The decree is modified by eliminating therefrom the provisions concerning the fund on deposit in the Forest City National Bank of Rockford to the credit of Harriet E. Weber, and as so modified the decree is affirmed.

*Decree modified and affirmed.*