## B. F. Gray, Adm'r., et. al., Appellees, v. John B. Hayhurst, Appellant.

### Gen. No. 5180.

1. CONVEYANCES—*what essential to show absolute deed in fact mortgage.* The law presumes that a deed is the absolute conveyance which it purports to be on its face, until the contrary appears. If a party claims that an absolute deed is, in fact, a mortgage, he must establish that fact by evidence which is clear, satisfactory and convincing, and he must show that a debt to the grantee existed which was to be secured by the deed.

2. REDEMPTION—*what defense to right of.* The right to redeem from a deed absolute on its face which was intended as a mortgage will not be recognized and enforced in equity if it has been allowed by lapse of

time to become stale and the delay is not accounted for and a showing of good faith and diligence made.

3. LACHES—*when defense need not be specifically relied upon in answer.* If the defense of laches is apparent from the face of the bill it may be relied upon as ground for the affirmance of a decree of dismissal for want of equity, if the answer denied that the complainant was entitled to the relief prayed and asked that the same advantage be given to such answer as would have been allowed had a demurrer been filed.

4. APPEALS AND ERRORS—*what cannot be complained of.* A party cannot assign as error rulings of the court which do not prejudicially affect his own interest.

5. INTEREST—*when chargeable upon advancements.* If by law a testator directs that in the distribution to be made of his estate notes due from the distributees shall be charged against such distributees respectively, the interest upon such note should likewise be charged where the intent of the testator to that effect is apparent from the entire will.

6. STATUTE OF LIMITATIONS—*when no defense.* A distributee under a will is not entitled to avail of the defense of the statute of limitations against notes the amounts of which by the terms and conditions of such will are required to be deducted upon the making of distribution.

Bill in chancery. Appeal from the Circuit Court of Kankakee county; the Hon. FRANK L. HOOPER, Judge, presiding. Heard in this court at the April term, 1910. Affirmed. Opinion filed October 18, 1910.

H. K. & H. H. WHEELER, for appellant.

W. R. HUNTER and EBEN B. GOWER, for appellees.

MR. JUSTICE DIBELL delivered the opinion of the court.

William Hayhurst died January 20, 1891, holding the legal title to certain homestead lots in the village of Sherburnville and also to 160 acres of land, described as the east half of the southwest quarter and the west half of the southeast quarter of section three in township thirty-one north and of range fourteen east of the third principal meridian, all in Kankakee county, and also owning notes signed by his son John B. Hayhurst, and others signed by his son Jerome A. Hayhurst, and others signed by his son Edwin L. Hayhurst. He left a last will, which was admitted to probate. He therein made provision for his wife, including an annu-

ity during her life, and gave legacies to certain grandchildren. The fourth and fifth paragraphs of said will were as follows:

"Fourth, I give and devise and bequeath the remainder of my property both real and personal to my children, John B. Hayhurst, Lyman W. Hayhurst, Jerome A. Hayhurst, Edwin L. Hayhurst, Nancy Lyon, Alice Cleaver and Clara Jones, to each, share and share alike, each and every one of my children, that I or my estate may hold a note against shall receive said notes, as a part of his or her share of my estate, no part of my estate is to go to my children until after the death of my wife.

Fifth, It is my desire and will that my moneys shall be kept at interest, until the death of my wife, then my real estate to be sold, and the proceeds thereof, together with my moneys and personal property is to be divided as above set forth."

The persons named as executors declined to act, and John B. Hayhurst and George W. Lyon, the husband of Nancy Lyon, became administrators with the will annexed. Some years later they resigned and B. F. Gray became administrator *de bonis non* with the will annexed. Alice Cleaver died, leaving Walter Cleaver her sole legatee and devisee. The widow of William Hayhurst died in February, 1905. On November 29, 1905, B. F. Gray, the administrator, and Nancy Lyon, Lyman W. Hayhurst, Clara Jones and Walter Cleaver, filed a bill in equity against John B., Jerome A., and Edwin L. Hayhurst, and others, seeking (1) to remove clouds from the title of deceased to the homestead in Sherburnville; (2) a construction of the will as to said notes given by certain sons and as to the rate of interest at which they should be computed as a part of the estate; and (3) the appointment of a trustee to sell the land and divide the estate pursuant to the will. John B., Jerome A., and Edwin L. Hayhurst, each filed a separate answer, and John B. Hayhurst filed a cross-bill against the administrator and the other devisees and legatees named in the fourth paragraph. By his answer and his cross-bill, John B. Hayhurst claimed to be the equitable owner of said 160 acres of land, and alleged

that he caused said tract to be conveyed to his father, William Hayhurst, as security for a loan of $1,600 in 1886, and alleged that his father had been in possession, receiving the rents and profits thereof, since said conveyance. He asked for an accounting between himself and the estate of his father and the devisees, and that he be charged with said sum of $1,600 and the interest thereon and with the taxes and the necessary repairs on the real estate, and be credited with the rents and profits, and that he be permitted to redeem said premises upon payment of the balance found due against him. His answer also related to the notes executed by him. Proofs were taken before the master and by deposition and, upon a hearing, a decree was entered dismissing the cross bill for want of equity, removing the clouds from the title to the Sherburnville lots, relieving the sons from liability on some of their notes and charging the share of John B. Hayhurst with the rest of his notes with interest according to their face from their date till they should be delivered to John B. Hayhurst upon a division of the estate; and with a like provision as to the notes to Jerome A. The decree directed the master to sell the lands and to divide the proceeds and the amount then due upon the promissory notes held valid, pursuant to the provisions of the fourth paragraph of the will. John B. Hayhurst appealed and we affirmed the decree. We afterwards granted a rehearing and withdrew the opinion previously filed.

In 1871 James M. Adsit, Sr., of Chicago, owned the 160 acres above described, and the 80 acres next east thereof, being the east half of the southeast quarter of said section three. On April 1, 1871, by written contract between Adsit and John B. Hayhurst, Adsit agreed to convey the said 240 acres of land to John B. Hayhurst in fee simple clear of encumbrances by warranty deed, upon John B. Hayhurst paying him therefor $4,800 (which was $20 per acre) as follows: $1,000 on the first day of April in each of the years, 1873, 1874, and 1875, and $800 on the first day of April, 1876, with interest from date at 6% per annum, payable annually, and all taxes on said premises, including

the taxes for 1871. It was therein agreed that if John B. Hayhurst failed to make any of these payments, Adsit might declare the contract forfeited and retain all payments in liquidation of damages and have the right to reenter, and that time should be of the essence of the contract. It will be observed that the payments enumerated amounted only to $3,800, instead of $4,800. An endorsement on the back of the contract giving the date when each payment was to mature, shows that $1,000 was to be paid on April 1, 1872, which payment was omitted from the body of the contract. An endorsement upon the back of the contract in the handwriting of Adsit shows that on March 29, 1872, he received $1,288 on the contract, which by computation will be found to be the interest on the entire sum for one year at 6%, and $1,000 on the principal of the contract. An endorsement in the handwriting of Adsit shows that on April 2, 1875, he received $1,878.68, which by computation, will be found to be interest on $3,800 from April 1, 1872, to April 1, 1875, and the $1,000 of principal due on April 1, 1873, and $194.68 more, which latter sum may have been to repay Adsit for taxes on the real estate advanced by him during those years or may have been intended to apply upon the balance unpaid on the contract. On the day of the last mentioned payment, April 2, 1875, Adsit conveyed the east half of the southeast quarter of said section three to John B. Hayhurst, leaving the contract still in force as to the two tracts of 80 acres each first described in this opinion. John B. Hayhurst had then paid $2,000 of the principal. If all the land be treated as of equal value, the purchase price of the 80 acres Adsit so deeded to John B. Hayhurst at $20 per acre would amount to $1,600, so that he had paid for that 80 acres and at least $400, and perhaps $594.68, upon the principal sum agreed to be paid for the remaining 160 acres of land. The contract contains no further endorsements of payments. The tax books show subsequent sales of this 160 acres for taxes and redemptions by Adsit and subsequent payments of taxes by others than John B. Hayhurst.

On July 31, 1879, Adsit wrote John B. Hayhurst the following letter:

"Your favor of......inst. received with enclosures and shall have attention.

Very respectfully,<br>
JAMES M. ADSIT.

I wrote you the 15 to know what you expected to do & also if you had kept the Taxes paid & so far have not heard from you. Something must be done at once in this land matter or I shall close up on you.

Let me hear from you on receipt of this."

On April 8, 1886, Adsit wrote John B. Hayhurst a letter, the body of which is as follows:

"I have yours of April 1st & in reply will say you send me $1,622.86 dollars as I wrote you the 18th of March on receipt of which I will send you deed as directed. As you did not reply to mine of the 18th of March, I paid the tax of 1885, 22.86 dollars this with the purchase money. $1,600
Tax 1885 ................................ 22.86

$1,622.86"

Owen O. Hayhurst, son of John B., and grandson of William, testified both before the master and afterwards by deposition taken in Colorado, concerning a conversation between his grandfather and his father at the house of the latter in Kankakee county in April, 1886. He testified that William told John B. that he had heard that that land was for sale and asked him if he was going to sell it; that John B. said he was going to sell it and he had to have the money; that William said to John B., "I will let you have the money till you can sell the place, but I want the interest on it and what expense I am to;" that the land referred to was the 160 acres; that the sum of $1,600 was mentioned; that John B. told William that he would make a deed for the $1,600 until he could sell the place; that nothing was said about the kind of deed or the rate of interest or the length of time John B. would have to pay it. In his deposition he was more specific that William agreed to let John B. have some money

to pay off James M. Adsit, and that John B. was to let William have the deed for the land for security for the money; that John B. was to take the money to Chicago and get from Adsit a deed to William, and John B. was to pay William interest on the money, and that they agreed that when the land was sold John B. was to pay William the money loaned, together with interest thereon; that William was to have a deed to the land as security for the loan of the money to pay off Adsit; that the amount mentioned was $1,600; and that they made arrangements for John B. to take the money and go to Chicago and pay off Adsit and take a deed from Adsit running to Williams; that there was nothing said as to the length of time for which the loan was made, farther than that when the land was sold, the money was to be paid back with interest. James N. Orr, an attorney at Kankakee, testified that early in 1886 he collected about $5,500 as attorney for William Hayhurst in a certain foreclosure suit, which sum he placed in bank for William Hayhurst; that in the spring of 1886 William and John B. Hayhurst came to his office and had a conversation in his presence, in which William said that John B. could have some money to pay upon a contract for the purchase of some land, so that John B. would not lose the payments he had made on it; that the three of them went to the bank and got some money there out of the moneys Orr had deposited to the credit of William, but Orr could not state the amount, and that John B. said they would have to go to Chicago to see about it. Orr testified that he understood from the conversation that John B. was largely in debt and that his father was trying to help him out of the difficulty about this land; that John B. was unable to pay for the land under the contract and that his father was furnishing the money to help him out; that they were going to take up the Adsit contract and get a deed for the land and talked of going to Chicago for that purpose. Orr testified that he suggested a written contract in relation to the matter and that William said it was not necessary, that they had a great deal of business with each other and that the matter was not yet closed

up, and that if they needed anything they would have it
later. James Dickey testified that about this time he knew
that William Hayhurst had about closed up this foreclosure,
and that the witness wished to borrow some money, and
that William had partly promised to let him have some,
and that he went to see William about it and William told
him he could not let him have it as he had just had to let
John have it to pay out. The letter above set out of April
8, 1886, from Adsit to John B. Hayhurst, shows that Adsit
had written to John B. on March 18, 1886; that John B. did
not reply to that letter and that because he did not reply
Adsit had paid the taxes on this land for 1885; that on April
1, 1886, John B. had written Adsit, making some proposition
for the payment of money on the contract in consideration of
which John B. proposed that a deed be made as he should
direct. It will also be observed that if no other payments
had been made than those endorsed on the contract, then there
was due Adsit thereon either $2,800 or at least $2,605.32 of
principal, besides interest for over eleven years and such
taxes as Adsit may have paid. John B. Hayhurst was a wit-
ness in his own behalf as to matters occurring after the death
of his father, and, in answer to a question put him on cross
examination, stated that he always claimed that he paid
$1,600 on this real estate, and no objection was made to that
answer.

On April 13, 1886, five days after the letter of April 8,
above set out, Adsit and his wife conveyed the 160 acres
to William Hayhurst by warranty deed for an expressed con-
sideration of $1,600 which was no doubt the money referred
to in the conversations testified to by Owen Hayhurst and
by Orr and taken from the bank in Orr's presence. Adsit
had died and the deposition of his son was taken, and his
father's books, concerning this land, were present, and it was
shown that the payments endorsed on the contract appeared
on his books and a statement that on April 13, 1886, he sold
this land to William Hayhurst for $1,600. No other pay-
ments on this land appeared on Adsit's books. Appellant
contends that it is a just inference from this evidence that

Adsit made this deed upon the completion of all the payments called for by the contract, which was a total of the principal sum of $3,200, for these two tracts of 80 acres each. Appellees contend that there is no presumption that any money was paid upon the contract except that endorsed on the contract or appearing on Adsit's books. The proof showed that this land was then very wet; that John B. Hayhurst had dug some ditches upon it to drain it and had put some fencing upon it and cultivated a few acres in one corner, but only raised hay upon the most of it. Appellees introduced proof tending to show that it was a very poor piece of wet, swampy land and that in April, 1886, its value did not exceed $10 per acre, or the sum which William Hayhurst then paid or advance. Appellant introduced proof tending to show that it was then worth from $25 to $30 per acre. It is impossible that we should know which opinions were the more valuable. Thereafter a drainage ditch was put through that region by special assessment, and there has been a great increase in the value of lands, and it is conceded that the land is now worth $100 per acre. These witnesses, testifying in flush times, were trying to remember the condition and value of this land more than twenty years before they testified. It is obvious that exact and accurate testimony could not be expected upon a subject so remote in time and memory. If the payment made on April 13, 1886, completed the full agreed purchase price of $3,200 for this 160 acres, it is strange that $3,200 was not stated in the deed as the consideration instead of only the $1,600 paid that day. It may be that this paid the full agreed consideration. It may be, on the other hand, that the land in fact had been originally bought by Hayhurst at an extravagant price; that Adsit had become weary of his inability to collect either principal or interest and made a proposition, at that time in 1886, fifteen years after the date of the contract, to take $1,600 in satisfaction for his claim regardless of the amount due under the contract. It will be noticed that the evidence of Owen Hayhurst and Orr relates to a period before the money was actually paid and the deed taken. Prob-

ably the money was paid and the deed made in strict pursuance to the previous arrangement testified to by these witnesses, yet it is entirely possible that William and John B. Hayhurst had some other and different understanding before the money was actually paid and the deed executed. We have stated substantially all of the events shown by the evidence up to the making of the deed.

The proof as to what afterwards occurred is to be considered in two aspects, first, as bearing on the question whether the arrangement between the father and the son was as appellant claims, and, second, whether appellant is now in a position to obtain from a court of equity the relief which he seeks. Possession of the land was immediately delivered to William Hayhurst. Appellant cut hay therefrom for two years and delivered to his father one-half of the product as rent. Since that time, appellant has never been in possession of the premises. Upon the making of the deed the land was afterwards assessed to William Hayhurst. Appellant has never since paid any taxes on the land. Appellant has never paid to his father or to the administrators any interest on said sum of $1,600. When appellant and Lyon became administrators they filed an inventory in which this land was included as real estate of William Hayhurst, and the inventory stated, "Title in fee simple." Appellant testified that he does not think that the words just quoted were in the inventory when he signed it. Lyon testified that they were, and there is every probability that he is correct. The proof shows that William Hayhurst was in the habit of taking notes from his sons when he loaned them money, and a number of such notes were in his hands at his death. The administrators inventoried these notes. William did not take any note from appellant for this $1,600. Appellant did not cause a statement to be made in the inventory that he owed his father $1,600 or any other sum upon this transaction. If the arrangement between appellant and his father was as he now claims and if that arrangement had not been abrogated before his father died, it would have been natural that he should advise his co-administrator, Lyon, that his father only held

the title to this 160 acres by way of mortgage and that the equitable title was in appellant, and he would naturally have insisted that a statement of the facts should appear in the inventory. He also would naturally have caused the inventory to state that he owed his father $1,600 and interest and taxes and improvements, less the rents and profits. Appellant sought to explain the condition of this inventory by testifying that he consulted D. H. Paddock, a lawyer now deceased, shortly after the death of his father, about the time they were probating the will. At one time he testified that Paddock told him that he could not do anything while his mother was living; and at another time that Paddock told him that it was best not to do anything while his mother lived. He does not state what information he gave Paddock. He asks us to infer that he told Paddock something about the arrangement under which his father paid $1,600 and took the deed. Excluding from consideration his own testimony that he told Paddock something to which Paddock made the responses just stated, there is no proof in this record that from April 13, 1886, to the date when he filed his answer and cross bill in this cause, January 20, 1906, a period of nineteen years, nine months and seven days, he ever made any statement to any human being that he owned this real estate or had borrowed $1,600 from his father thereon. That statement to Paddock whatever it may have been, was to a man who is dead. This absence of any claim for almost twenty years casts great doubt upon its genuineness and justice. If the witnesses are to be believed the inventory is not the only respect in which his conduct and language has been inconsistent with his present claims. His mother renounced the provisions of the will in her favor. The administrators have, ever since, paid her one-third of the rents from this land. After William Hayhurst died and the will was proved, a judgment creditor of Edwin Hayhurst levied an execution upon the apparent interest of Edwin in this land and advertised it for sale. Mrs. Lyon telephoned to appellant the fact that the land had been advertised for sale on a certain date on an execution against Edwin, and appellant attended the

sale of his own volition, bid the amount of the execution and bought in Edwin's interest and, about a year later, allowed Edwin to redeem and pay him back the money. This act was entirely inconsistent with his present claim that this is his land. Henry Hayden, a son-in-law of Nancy Lyon, testified that he had a note against the estate of William Hayhurst and asked appellant if he could pay it, and that appellant answered that he had not a dollar in the estate, that he had nothing in the estate. George W. Lyon testified that right after the land was deeded to William Hayhurst he heard appellant say that his father paid $10 per acre for the land and made a good bargain. Appellant denied making these statements.

The law presumes that a deed is the absolute conveyance which it purports to be on its face, till the contrary appears. If a party claims that an absolute deed is, in fact, a mortgage, he must establish that fact by evidence which is clear, satisfactory and convincing, and he must show that a debt to the grantee existed, which was to be secured by the deed. Heaton v. Gaines, 198 Ill. 479; Gannon v. Moles, 209 Ill. 180; Caraway v. Sly, 222 Ill. 203; Deadman v. Yantis, 230 Ill. 243. The conduct of appellant, from the time the deed was made to the time when he filed his answer and cross bill, is so inconsistent with his present claim that that deed was given only to secure the payment of money, that the more reasonable conclusion from all the evidence seems to us to be, either that he abandoned all claim to the property when it was conveyed to his father, or that he had only some loose and undefined expectation that if the land sold for more than his father put into it, he would receive some benefit therefrom, or that afterwards, during his father's lifetime, they made some other arrangement. We cannot say that the court below ought to have decided that this evidence was so clear and convincing as to overcome the terms of this deed.

But if it were held that it is clearly established that in April, 1886, appellant borrowed $1,600 from his father and caused Adsit to convey the land to his father to secure that debt, it does not follow that he is now entitled to redeem.

He did no act in recognition or performance of his obligation
for nearly twenty years, during which time the land has
very greatly enhanced in value. In Breit v. Yeaton, 101 Ill.
242, one of the complainants had been of age about seven and
a half years before the bill was filed seeking relief against
certain transactions. The court held that as to that par-
ticular complainant his laches had been such as to preclude
his right to relief. In McDonald v. Stow, 109 Ill. 40, the
complainant had delayed asserting his right in equity thirteen
years and it was held that his laches was inexcusable and that
he ought to have asserted his right within seven years. In
McDearmon v. Burnham, 158 Ill. 55, the party complaining
had delayed fourteen years to assert his rights. In holding
that the facts showed such laches and neglect on his part as
would cause a court of equity to refuse him any relief, even
though he had once a right of redemption in the land there
in question, and that he had suffered his demand to become
stale and had shown no sufficient reason why he did so, the
court said: "When a court of equity is asked to lend its
aid in the enforcement of a demand that has become stale,
there must be some cogent and weighty reasons presented why
it has been permitted to become so. Good faith, conscience
and reasonable diligence of the party seeking its relief are the
elements that call a court of equity into activity. In
the absence of these elements the court remains pas-
sive, and declines to extend its relief or aid. It has always
been the policy to discountenance laches and neglect." In
Walker v. Warner, 179 Ill. 16, where there had been a
delay of over ten years before the filing of a bill to redeem,
the court said: "The right of redemption being a purely
equitable estate, a court of chancery will not protect and
enforce it unless equitable considerations require it to do so.
As the right is the creation of a court of chancery, it can only
be asserted in such court when its assertion is plainly equit-
able. It may, therefore, be lost, unless it is asserted within
a reasonable time, and before the situation of the parties has
changed, and the rights of others have intervened, or improve-
ments have been made. In other words, the right may be

lost by laches." In McMillan v. McMillan, 184 Ill. 230, delay of less than fourteen years to file a bill for relief was held to be such laches as barred relief. The delay in this case was greater than in any of those above cited.

But appellant contends that laches was not pleaded in the answer and in the amendment thereto to his cross bill, and that therefore appellees cannot avail of his laches to sustain the decree dismissing the cross bill. The delay in time fully appeared in the cross bill and was not explained therein. The answer to the cross bill admitted some of the allegations and denied others and contained nothing doing away with the apparent laches appearing on the face of the cross bill, and it denied that appellant was entitled to the relief demanded in his cross bill, and it prayed the same advantage as if the defendants had demurred to the cross bill. In Coryell v. Klehn, 157 Ill. 462, the question whether laches must be set up by answer, and whether it could be reached by demurrer when the laches appeared in the bill itself, was considered at length upon the authorities, and the court reached this conclusion: "While the general rule is that the defense of laches must be made by plea or answer, yet such rule does not apply when the bill already stated the causes of and excuse for delay." In Wilcoxon v. Wilcoxon, 199 Ill. 244, it was held that it was the duty of the complainant to state in his bill whatever he relied upon to rebut or remove the presumption of laches arising from his delay of twelve years in seeking relief. The court affirmed a decree which dismissed the bill, because the complainant had neglected his right for such a great length of time that he was deemed guilty of laches. In Wilcoxon v. Wilcoxon, 230 Ill. 93, another suit between the same parties involving substantially the same subject-matter, the court said: "A cross bill, when filed to obtain affirmative relief, like an original bill, should set forth equitable grounds of relief and show a state of facts upon which a court of equity could be called upon to act if the same grounds were presented in an original bill. (Gage v. Mayer, 117 Ill. 632; Story's Eq. Pl. 10th Ed. sec. 628.) There is no excuse offered by appellant which in equity can relieve him

from the imputation of laches in this case that has not already been adjudged insufficient by this court in the former case. We regard his situation even worse now than it was when this matter was before us on the former occasion." In Hamilton v. Hamilton, 231 Ill. 128, the court said: "Courts will not enforce resulting trusts after a great lapse of time or laches on the part of the supposed *cestui que trust,* especially when it appears that the supposed nominal purchaser has occupied and enjoyed the estate. Perry on Trusts, sec. 141. (McDonald v. Stow, 109 Ill. 40.) Equity does not encourage stale claims, since by lapse of time there must, of necessity, be great difficulty in ascertaining the exact facts as to the matter in controversy. In this case the right of the plaintiff in error had its origin, according to the allegations of the bill, in 1870,—thirty-seven years ago,—and his right has been openly repudiated for fifteen years. Unreasonable delay has been held to be a bar to equitable relief even against a trustee." In Foss v. People's Gas Light & Coke Co., 241 Ill. 238, the circuit court sustained a demurrer to an amended bill and the supreme court held that as the complainant had knowledge for many years that the defendant was pursuing a course of conduct in respect to him which amounted to a total denial of all his rights, reasonable diligence required that he should have made his appeal to a court of equity before his claim became stale. Here there is no positive proof that appellant paid any money of his own upon this land since April 2, 1875. He certainly has paid nothing in the way of interest, taxes, improvements or otherwise since April 13, 1886. He made no claim whatever that he had any interest in this land, except as a devisee under his father's will, until nearly twenty years after the land was conveyed to his father. We are of opinion that this should be treated as a stale claim which equity will not enforce, and that this defense is available both under the general denial of a right to relief and under the demurrer contained in the answer to the cross bill.

Appellant has assigned for error the action of the court in allowing notes of Jerome A. Hayhurst and Edwin L. Hay-

hurst against their shares. Those portions of the decree did not injure appellant, and he alone has assigned error, and he cannot assign as error that which only injures some other party. Deceased held six notes against appellant. The court held that under the proof three of them should not be charged against appellant's share of the estate. Appellant can only complain as to the remaining three notes. These notes were due in 1877, 1879, and 1882. Two of them bore interest at ten per cent if not paid when due, and the other at eight per cent if not paid when due. The decree charged these notes against appellant's share with interest at the rate specified in the notes from their dates till they shall be surrendered to appellant on the final division of the estate. It is urged that it is an injustice to charge this interest after the death of William Hayhurst. We think the will means that the interest should be so charged, for it provides that no part of the testator's estate is to go to his children till after the death of his wife, and that his money shall be kept at interest till after her death. The wife renounced the will, and the proceeds of the real estate from year to year seem to have been divided, the widow taking one-third by consent of all the children, and the devisees, including appellant, taking the rest. If appellant and the other devisees received the income from the real estate, or even if that income had been allowed to accumulate till the period of distribution, no reason is seen why that portion of the testator's money evidenced by these notes should not contribute to increasing the general estate. They must be brought into the division, not because the statute of limitations would not be a defense to them, but because the testator directed them to be brought into the division of his estate. Appellant has elected to take under the will of the testator. He must therefore take subject to all conditions the testator has seen fit to impose. If appellant desired to be relieved from the unusual rates of ten per cent and eight per cent, he could have paid these notes to the administrator and thus terminated the interest, and the administrator could have loaned the money out at interest, pursuant to the directions of the will. We find no legal grounds upon which

we can relieve him of this charge. He contends that because of the hardship these notes inflict upon him on account of the many years of heavy interest, he should have some special relief in relation to the land. These notes were due long before the land was deeded to his father and had no connection with that transaction, and we do not find, in the fact that he was made a defendant in this proceeding to cause the land to be sold and the estate divided, anything which entitles him to the relief sought by his cross bill.

The decree is therefore affirmed.

*Affirmed.*